JACOBS v HEADLEE

Docket No. 68073. Submitted December 12, 1983, at Detroit.—Decided
June 5, 1984. Leave to appeal applied for.

Plaintiff, Dick M. Jacobs, the nominee of the Libertarian party
for governor in the 1982 election, brought an action in the
Oakland Circuit Court against defendants, Richard Headlee
and James Blanchard, the nominees of the Republican and
Democratic parties respectively, challenging the constitutional-
ity of the Michigan campaign financing and practices act as
applied to the 1982 election. The trial court, John N. O'Brien,
J., determined the act to be constitutional and entered an order
to that effect. Plaintiff appeals. *Held:*

1. The public financing scheme does not violate the Michigan
Constitution's guarantees of due process, equal protection, pu-
rity of elections, and freedom of speech.

2. The minimal scrutiny test is the appropriate test to apply
to plaintiff's equal protection challenge. Under this analysis,
the public financing scheme must be upheld since the legisla-
tion is rationally related to legitimate governmental objectives
and does not deny plaintiff equal protection.

3. The public financing scheme does not create an unfair
advantage for a major party candidate.

Affirmed.

1. CONSTITUTIONAL LAW — DUE PROCESS — ELECTIONS — CAMPAIGN
FINANCING.

The Michigan campaign financing and practices act does not
violate the Michigan Constitution's guarantees of due process,
equal protection, purity of elections, and freedom of speech
(Const 1963, art 1, §§ 2, 5 and 17, and art 2, § 4; MCL 169.201 *et
seq.;* MSA 4.1703[1] *et seq.*).

---

REFERENCES FOR POINTS IN HEADNOTES

[1-7] 16A Am Jur 2d, Constitutional Law § 804.

26 Am Jur 2d, Elections §§ 289, 290.

State regulation of the giving or making of political contributions
or expenditures by private individuals. 94 ALR3d 944.

[3] 16A Am Jur 2d, Constitutional Law § 750.

[4] 16A Am Jur 2d, Constitutional Law § 749.

2. Elections — Public Financing — Gubernatorial Elections.

Public financing of gubernatorial elections has been determined by the Legislature to be for the general welfare of the public; such financing has the beneficial public purposes: (1) of allowing gubernatorial candidates to become less dependent upon financial support from special interest groups, thus promoting the appearance and reality of an executive with the welfare of the public at large in mind; (2) of encouraging greater participation in gubernatorial campaigns by reducing financial obstacles for candidates with less fundraising abilities and by enhancing the importance of smaller contributions; and (3) of promoting the dissemination of political ideas to the electorate by gubernatorial candidates who have been encouraged to campaign for the governorship.

3. Constitutional Law — Equal Protection — Elections — Public Financing — Minimal Scrutiny Test.

Public financing of elections statutes do not involve fundamental rights and need not meet exacting scrutiny when challenged on equal protection grounds; the minimal scrutiny test is the appropriate test to employ in such a challenge.

4. Constitutional Law — Equal Protection — Elections — Public Financing — Minimal Scrutiny Test.

A public financing of elections statutory scheme challenged on equal protection grounds must be upheld under the minimal scrutiny test if the challenged classification is rationally related to a legitimate governmental interest; the burden is on the party attacking the classification to show that the classification is without reasonable justification.

5. Constitutional Law — Equal Protection — Elections — Public Financing.

The Michigan campaign financing and practices act is rationally related to legitimate governmental objectives and does not deny equal protection; the governmental interests served include eliminating the improper influence of large private contributions and relieving candidates from the rigors of soliciting private contributions; the Legislature's interest in not funding hopeless candidacies with large sums of public money necessarily justifies the withholding of public assistance from candidates without significant public support (Const 1963, art 1, § 2; MCL 169.201 *et seq.;* MSA 4.1703[1] *et seq.).*

6. Constitutional Law — Purity of Elections — Public Financing.

The public financing scheme provided in the Michigan campaign

financing and practices act does not provide any unfair advantage to major party candidates and does not violate the Michigan Constitution's purity of elections clause (Const 1963, art 2, § 4; MCL 169.201 *et seq.;* MSA 4.1703[1] *et seq.).*

7. CONSTITUTIONAL LAW — FREEDOM OF SPEECH — ELECTIONS — PUBLIC FINANCING.

The public financing scheme provided in the Michigan campaign financing and practices act uses public money to facilitate and enlarge public discussion and participation in the electoral process and does not chill a minor party's right to freedom of speech (Const 1963, art 1, § 5; MCL 169.201 *et seq.;* MSA 4.1703[1] *et seq.).*

*Robert W. Roddis,* for Dick Jacobs.

*Jenkins, Nystrom, Hitchcock, Parfitt & Nystrom, P.C.* (by *Stephen J. Hitchcock* and *Raymond I. Foley),* for Richard Headlee.

*George E. Ward,* for James Blanchard.

Before: DANHOF, C.J., and ALLEN and M. E. DODGE,* JJ.

PER CURIAM. This appeal involves plaintiff's constitutional challenge to the Michigan campaign financing and practices act, MCL 169.201 *et seq.;* MSA 4.1703(1) *et seq.,* as applied to the 1982 Michigan gubernatorial general election. Plaintiff was the nominee of the Libertarian party while defendants Richard Headlee and James Blanchard were the nominees of the Republican and Democratic parties, respectively.

Plaintiff filed this action on September 13, 1982, seeking declaratory and injunctive relief on the grounds that the act violated his right to due process, equal protection and freedom of speech under both the Michigan and United States Con-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

stitutions. Plaintiff filed an amended complaint alleging that the financing scheme in the act violated Const 1963, art 2, § 4, which guarantees the purity of elections. Plaintiff sought an order declaring the statutory campaign financing scheme unconstitutional and requiring defendants to return the funds they had received pursuant to the act. The trial court entered an order on October 29, 1982, finding the act constitutional and denying plaintiff's request for injunctive relief. Plaintiff appeals as of right.

Under the act, both Headlee and Blanchard qualified for $750,000 in state campaign financing funds since they represented "major political parties" as that term is defined in § 10 of the act.[1] Plaintiff did not qualify for campaign financing funds under § 65 because he was the nominee of a minor party (a party qualified to be listed on the general election ballot but not qualifying as a major party) which did not receive 5% or more of the vote.[2] Plaintiff also failed to qualify for match-

---

[1] MCL 169.210; MSA 4.1703(10) provides:

"(1) 'Major political party' means a political party qualified to have its name listed on the general election ballot whose candidate for governor received 25% or more of the popular vote cast in the preceding gubernatorial election. If only 1 political party received 25% or more of the popular vote cast for governor in the preceding gubernatorial election, then the political party with the second highest vote shall be deemed a major party.

"(2) 'Minor political party' means a political party qualified to have its name listed on the general election ballot but which does not qualify as a major party."

Section 65(1), MCL 169.265(1); MSA 4.1703(65)(1), states that a major political party nominee is entitled to payment of not more than 75% of the spending limit designated in § 67, MCL 169.267; MSA 4.1703(67), for a general election. The expenditure limit in § 67 is $1,000,000 for one election.

[2] Section 65, subds (2) and (3) provide:

"(2) A minor political party nominee whose party received 5% or more of the vote for the same office in the last election is entitled to an amount of not more than 75% of the spending limit as designated in section 67, multiplied by the number of popular votes the minor party received in the preceding general election for governor which is

ing funds under § 65(5).

Plaintiff's challenges to the act on appeal are based entirely on the Michigan Constitution. He argues that the financing scheme in the act violates Michigan constitutional guarantees of due process, art 1, § 17; equal protection, art 1, § 2; purity of elections, art 2, § 4; and freedom of speech, art 1, § 5. We address these claims *seriatim.*

## DUE PROCESS

Plaintiff argues that the statutory scheme of publicly funding gubernatorial campaigns does not advance any legitimate governmental interest and violates due process. The campaign financing provisions in the Michigan act are generally similar to the provisions for public funding of presidential election campaigns in Subtitle H of the Internal Revenue Code of 1954, 26 USC 9001-9012, 9031-9042 (1970 ed, Supp IV).[3] In *Buckley v Valeo,* 424 US 1; 96 S Ct 612; 46 L Ed 2d 659 (1976), the United States Supreme Court considered, *inter alia,* federal constitutional challenges to the campaign financing scheme in Subtitle H. The court found no merit to a challenge brought on First and

divided by the average number of votes the major parties received in that general election for governor.

"(3) A minor political party nominee not eligible under subsection (2) but who receives more than 5% of the vote in that general election for governor is entitled to reimbursement in an amount of not more than 75% of the spending limit as designated in section 67, multiplied by the number of popular votes the minor party received in the preceding general election for governor which is divided by the average number of votes the major parties received in that general election for governor."

Plaintiff did not qualify for funds under § 65. No minor party nominee received more than 3% of the vote in the 1982 gubernatorial general election.

[3] See *Buckley v Valeo,* 424 US 1, 85-90; 96 S Ct 612; 46 L Ed 2d 659 (1976).

Fifth Amendment grounds, holding that public financing of elections does advance legitimate governmental goals:

"It cannot be gainsaid that public financing as a means of eliminating the improper influence of large private contributions furthers a significant governmental interest. S Rep No. 93-689, pp 4-5 (1974). In addition, the limits on contributions necessarily increase the burden of fundraising, and Congress properly regarded public financing as an appropriate means of relieving major-party Presidential candidates from the rigors of soliciting private contributions." 424 US 96.

The Michigan Supreme Court has likewise recognized in an advisory opinion the legitimate goals furthered by public financing of gubernatorial elections:

"Similarly, the Michigan Legislature has determined that public financing of gubernatorial elections is for the general welfare of the public, and it is well within the Legislature's powers to so determine.

"Chapter 3 may be said to have any of the following beneficial public purposes:

"1. To allow gubernatorial candidates to become less dependent upon financial support from special-interest groups, thus promoting the appearance and reality of an executive with the welfare of the public at large in mind.

"2. To encourage greater participation in gubernatorial campaigns by reducing financial obstacles for candidates with less fundraising abilities, and by enhancing the importance of smaller contributions.

"3. To promote the dissemination of political ideas to the electorate by gubernatorial candidates who have been encouraged to campaign for the governorship." *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10),* 396 Mich 465, 497; 242 NW2d 3 (1976).

We conclude that the public financing scheme does not violate plaintiff's due process rights under the Michigan Constitution.

## EQUAL PROTECTION

Relying on *Socialist Workers Party v Secretary of State,* 412 Mich 571; 317 NW2d 1 (1982), plaintiff urges this Court to find that the act affects a fundamental right and to accordingly employ a "compelling state interest/least drastic means" test in considering whether the financing plan violates equal protection. In *Socialist Workers Party,* the Supreme Court invalidated a statute imposing certain requirements for candidates of minor parties to be placed on primary election ballots. The Court found that ballot access implicates two distinct fundamental rights, the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters to cast their votes effectively. *Socialist Workers Party, supra,* p 588, quoting *Williams v Rhodes,* 393 US 23, 30; 89 S Ct 5; 21 L Ed 2d 24 (1968). Plaintiff refuses to acknowledge the well-established distinction between ballot access cases and cases involving campaign financing schemes. The Court in *Buckley v Valeo, supra,* held that public financing of elections statutes do not involve fundamental rights and need not meet exacting scrutiny:

"In several situations concerning the electoral process, the principle has been developed that restrictions on access to the electoral process must survive exacting scrutiny. The restriction can be sustained only if it furthers a 'vital' governmental interest, *American Party of Texas v White,* 415 US 767, 780-781; 94 S Ct 1296; 39 L Ed 2d 744 (1974), that is 'achieved by a

means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity.' *Lubin v Panish,* 415 US 709, 716; 94 S Ct 1315; 39 L Ed 2d 702 (1974). See *American Party of Texas v White, supra,* p 780; *Storer v Brown,* 415 US 724, 729-730; 94 S Ct 1274; 39 L Ed 2d 714 (1974). These cases, however, dealt primarily with state laws requiring a candidate to satisfy certain requirements in order to have his name appear on the ballot. These were, of course, direct burdens not only on the candidate's ability to run for office but also on the voter's ability to voice preferences regarding representative government and contemporary issues. In contrast, the denial of public financing to some Presidential candidates is not restrictive of voters' rights and less restrictive of candidates'. Subtitle H does not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice; the inability, if any, of minor-party candidates to wage effective campaigns will derive not from lack of public funding but from their inability to raise private contributions. * * * Accordingly, we conclude that public financing is generally less restrictive of access to the electoral process than the ballot-access regulations dealt with in prior cases. In any event, Congress enacted Subtitle H in furtherance of sufficiently important governmental interests and has not unfairly or unnecessarily burdened the political opportunity of any party or candidate." 424 US 93-96. (Footnotes omitted.)

We therefore find that the minimal scrutiny test is appropriate. Under this analysis, the public financing scheme must be upheld if the challenged classification is rationally related to a legitimate governmental interest. The burden is on plaintiff to show that the classification is without reasonable justification. *Halstead v City of Flint,* 127 Mich App 148, 156; 338 NW2d 903 (1983).

The court in *Buckley* rejected the argument that the federal election campaign financing provi-

sions discriminated against minor and new parties in violation of the Fifth Amendment. As discussed above, the court found a legitimate governmental interest in eliminating the improper influence of large private contributions and relieving candidates from the rigors of soliciting private contributions. The court further stated with regard to the equal protection challenge:

"The States have also been held to have important interests in limiting places on the ballot to those candidates who demonstrate substantial popular support. *E.g., Storer v Brown, supra,* p 736; *Lubin v Panish, supra,* p 718-719; *Jenness v Fortson,* 403 US 431, 442; 91 S Ct 1970; 29 L Ed 2d 554 (1971); *Williams v Rhodes,* 393 US 23, 31-33; 89 S Ct 5; 21 L Ed 2d 24 (1968). Congress' interest in not funding hopeless candidacies with large sums of public money, S Rep No. 93-689, *supra,* p 7, necessarily justifies the withholding of public assistance from candidates without significant public support. Thus, Congress may legitimately require 'some preliminary showing of a significant modicum of support,' *Jenness v Fortson, supra,* p 442, as an eligibility requirement for public funds. This requirement also serves the important public interest against providing artificial incentives to 'splintered parties and unrestrained factionalism.' *Storer v Brown, supra,* p 736; S Rep No. 93-689, *supra,* p 8; HR Rep No. 93-1239, p 13 (1974). *Cf. Bullock v Carter,* 405 US 134, 145; 92 S Ct 849; 31 L Ed 2d 92 (1972).

\* \* \*

"As conceded by appellants, the Constitution does not require Congress to treat all declared candidates the same for public financing purposes. As we said in *Jenness v Fortson,* 'there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. \* \* \* Sometimes the grossest discrimination can lie in treating things that are different as though they

were exactly alike, a truism well illustrated in *Williams v Rhodes, supra.'* 403 US 441-442." 424 US 96-98.

We find the analysis in *Buckley* equally applicable to plaintiff's equal protection challenge under the Michigan Constitution. We conclude that the legislation is rationally related to legitimate governmental objectives and does not deny plaintiff equal protection under Const 1963, art 1, § 2.

## PURITY OF ELECTIONS

Const 1963, art 2, § 4 provides in part:

"The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting."

The Court in *Socialist Workers Party, supra,* p 596, stated:

"The 'purity of elections' clause has been interpreted by this Court to embody two separate concepts: first, that the constitutional authority to enact laws to preserve the purity of elections resides in the Legislature; and second, 'that any law enacted by the Legislature which adversely affects the purity of elections is constitutionally infirm'. *Wells v Kent County Board of Election Comm'rs,* 382 Mich 112, 123; 168 NW2d 222 (1969). The *Wells* Court further stated:

" 'The phrase, "purity of elections," is one of large dimensions. It has no single, precise meaning. The * * * cases demonstrate, however, that one of the primary goals of election procedures is to achieve equality of treatment for all candidates whose names appear upon the ballot.' 382 Mich 123."

The purity of elections concept requires "fair-

ness and evenhandedness in the election laws of this state". *Socialist Workers Party, supra,* p 598.

Contrary to plaintiff's contentions, this Court finds that the act's public financing scheme does not provide any *unfair advantage* to major party candidates. As noted in the equal protection analysis, the placing of declared candidates into different categories for public financing purposes is based on legitimate governmental objectives and does not result in unfairness. Indeed, unfairness would result if all candidates were eligible for the same amount of funds without regard to public support. As noted in *Buckley, supra,* any disadvantage suffered by a minor party candidate flows not from the financing eligibility requirements but from the minor party candidate's inability to raise private contributions. 424 US 94-95. Furthermore, the Court in *Buckley* recognized that a financing plan tied to acceptance of campaign expenditure limits may actually enhance the competitive position of minor party candidates:

"Furthermore, appellants have made no showing that the election funding plan disadvantages nonmajor parties by operating to reduce their strength below that attained without any public financing. First, such parties are free to raise money from private sources, and by our holding today new parties are freed from any expenditure limits, although admittedly those limits may be a largely academic matter to them. But since any major-party candidate accepting public financing of a campaign voluntarily assents to a spending ceiling, other candidates will be able to spend more in relation to the major-party candidates. The relative position of minor parties that do qualify to receive some public funds because they received 5% of the vote in the previous Presidential election is also enhanced. Public funding for candidates of major parties is intended as a substitute for private contributions; but for minor-party candidates such assistance may be viewed as a supple-

ment to private contributions since these candidates may continue to solicit private funds up to the applicable spending limit." 424 US 98-99. (Footnotes omitted.)

The Court also noted:

"Public financing of some candidates does not make private fundraising for others any more difficult; indeed, the elimination of private contributions to major-party Presidential candidates might make more private money available to minority candidates." 424 US 94, fn 128.

The Michigan statutory provisions do not deter any candidate from being placed on the ballot, freely campaigning, soliciting private contributions and qualifying for public funds under the formulas established in the act. Nor does the act prevent any voter from casting his vote for the candidate of his choice. The fact that some candidates cannot garner sufficient support to qualify for funding under § 65 does not demonstrate a lack of fairness or evenhandedness. We conclude that the public financing scheme does not create any unfair advantage and does not violate the purity of elections clause.

## FREEDOM OF SPEECH

Plaintiff argues that public financing "per se" violates the spirit of governmental neutrality in election procedures necessary to insure freedom of speech". Plaintiff also asserts that the act was designed and has the effect of encouraging candidates to abandon minor-party endeavors, resulting in the "enshrinement of the two current major parties", in violation of the freedom of speech guaranteed by the Michigan Constitution.

The Court in *Buckley* rejected a similar challenge under the First Amendment, finding that

public financing under federal law did not abridge freedom of speech:

"Although 'Congress shall make no law * * * abridging the freedom of speech, or of the press, 'Subtitle H is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people. Thus, Subtitle H furthers, not abridges, pertinent First Amendment values." 424 US 92-93. (Footnotes omitted.)

The Court also noted that public financing does not as a practical matter enhance major parties' ability to campaign to the detriment of minor parties:

"Any disadvantage suffered by operation of the eligibility formulae under Subtitle H is thus limited to the claimed denial of the enhancement of opportunity to communicate with the electorate that the formulae afford eligible candidates. But eligible candidates suffer a countervailing denial. As we more fully develop later, acceptance of public financing entails voluntary acceptance of an expenditure ceiling. Noneligible candidates are not subject to that limitation.[129]

"[129] Appellants dispute the relevance of this answer to their argument on the ground that they will not be able to raise money to equal major-party spending. As a practical matter, however, Subtitle H does not enhance the major parties' ability to campaign; it substitutes public funding for what the parties would raise privately and additionally imposes an expenditure limit. If a party cannot raise funds privately, there are legitimate reasons not to provide public funding, which would effectively facilitate hopeless candidacies." 424 US 95.

We find the First Amendment analysis in *Buckley* to be dispositive of plaintiff's claim herein. The public financing scheme does not chill plaintiff's right to freedom of speech guaranteed by the Michigan Constitution.

Affirmed.