McDONALD v GRAND TRAVERSE COUNTY ELECTION COMMISSION

Docket No. 237984. Submitted March 5, 2003, at Grand Rapids. Decided
      March 18, 2003, at 9:00 A.M. Leave to appeal sought.

      Patrick J. McDonald, an independent candidate for trustee of Green
      Lake Township in Grand Traverse County, brought an action in
      Grand Traverse Circuit Court against the Grand Traverse County
      Election Commission, the Honorable John D. Foresman, William
      Rokos, Linda Coburn, the state of Michigan, and the Secretary of
      State seeking a declaration that Michigan's straight-ticket ballot
      option, MCL 168.737, was unconstitutional; a writ of mandamus
      compelling the Secretary of State to promulgate new rules to elimi-
      nate the straight-ticket ballot option; and an injunction preventing
      the placing of the straight-ticket ballot option on the ballots for
      Green Lake Township. The defendants argued that the straight-
      ticket ballot option was not unconstitutional. On cross-motions for
      summary disposition, the court, Philip E. Rodgers, Jr., J., concluded
      that MCL 168.737 was not unconstitutional. The plaintiff appealed.

      The Court of Appeals held:

      1. When deciding whether a state election law violates a plain-
      tiff's fundamental right of association under the First and Four-
      teenth Amendments, the court will weigh the character and magni-
      tude of the burden the state's rule imposes on those rights against
      the interests the state contends justify that burden, and consider
      the extent to which the state's concerns make the burden neces-
      sary. Regulations imposing severe burdens on a plaintiff's rights
      must be narrowly tailored and advance a compelling state interest.
      Lesser burdens trigger a less exacting review, and a state's impor-
      tant regulatory interests will usually be enough to justify reason-
      able, nondiscriminatory restrictions.

      2. The straight-ticket ballot option places only a lesser burden on
      the plaintiff's right of association and does not warrant a strict-
      scrutiny review, because the straight-ticket ballot option did not
      prevent straight-ticket voters from splitting their tickets and voting
      for the plaintiff, and because any voter who desired to vote for the
      plaintiff could do so if the voter took the time and made the effort.

      3. The state has an important regulatory interest in maintaining
      and protecting the integrity of the election process and the stability
      of its political systems, and this important, if not compelling, inter-

est outweighs the burden imposed by the straight-ticket ballot option on the plaintiff's right to freedom of association. Thus, the straight-ticket ballot option did not deprive the plaintiff of his First Amendment right to freedom of association.

4. The Equal Protection Clauses of the United States and Michigan Constitutions protect persons only against invidious, intentional, or purposeful discrimination. The nature of the discrimination against the plaintiff is that voters desiring to vote for him must spend more time and make a greater effort to vote for him, while candidates affiliated with a party can receive a vote more quickly and easily from voters who vote straight-ticket. However, the straight-ticket ballot option did not prevent straight-ticket voters from voting for the plaintiff. This distinction is not the invidious type of discrimination proscribed by the Equal Protection Clause.

5. The plaintiff's equal-protection claim does not merit analysis under the strict-scrutiny test, because the plaintiff did not demonstrate discrimination of some substance sufficient to trigger application of the strict-scrutiny test in an equal-protection claim challenging a ballot-restricting statute. Thus, the plaintiff's equal-protection claim was only entitled to a lesser review, under which the plaintiff's claim failed for the same reasons his First Amendment right of association claim failed.

6. The straight-ticket ballot option does not violate the "purity of elections" clause of the Michigan Constitution because it is based on legitimate governmental objectives (protecting the integrity of the election process and the stability of the state's political system), and while it does provide some advantage to candidates affiliated with a political party by making it easier for voters to vote for those candidates, the straight-ticket ballot option does not provide an unfair advantage to those candidates.

7. The straight-ticket ballot option as set forth in MCL 168.737 was constitutional and did not deprive the plaintiff of any fundamental rights under the United States or Michigan Constitutions, nor does it violate the "purity of elections" clause of the Michigan Constitution.

8. The trial court did not abuse its discretion in refusing to impose discovery sanctions on the defendant Secretary of State because the defendant did not fail to answer interrogatories as ordered by the trial court. Similarly, the trial court did not abuse its discretion in awarding the Secretary of State costs and attorney fees under MCR 2.114, because the plaintiff's motion for discovery sanctions based on the Secretary of State's alleged failure to answer interrogatories was not well grounded in fact or warranted by existing law.

Affirmed.

ELECTIONS — STRAIGHT-TICKET VOTING — CONSTITUTIONAL LAW — FREEDOM OF
    ASSOCIATION — EQUAL PROTECTION — PURITY OF ELECTIONS.
    The statute that allows straight-ticket voting in partisan elections, as
    challenged by an independent candidate for office, was held to be
    not violative of federal and state constitutional guarantees of free-
    dom of association and equal protection, and of the "purity of elec-
    tions" clause of the state constitution (US Const, Am I, Am XIV;
    Const 1963, art 1, § 2, art 2, § 4).

Patrick J. McDonald in propria persona.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Gary P. Gordon*, Assistant Attorney General, for the defendants.

Before: WHITBECK, C.J., and CAVANAGH and BANDSTRA, JJ.

PER CURIAM. Plaintiff Patrick J. McDonald appeals as of right the trial court's order granting summary disposition pursuant to MCR 2.116(C)(10) to defendants Grand Traverse County Election Commission, the Honorable John D. Foresman, William Rokos, Linda Coburn, the state of Michigan, and the Secretary of State, and denying McDonald's motion for summary disposition. We affirm.

I. BASIC FACTS AND PROCEDURAL HISTORY

In August of 2000, McDonald filed a complaint against defendants. The complaint challenged the constitutionality of MCL 168.737, which provides for straight-ticket voting on voting ballots in the state of Michigan.[1] The complaint alleged that McDonald was

---

[1] In McDonald's first amended complaint, he alleged that MCL 168.684, MCL 168.685, MCL 168.696, MCL 168.703, MCL 168.706, and MCL 168.737, "and perhaps other statutes, rules, regulations, and instructions provide for straight party ticket voting on the ballots of the State of Michigan." On appeal, McDonald challenges the constitutionality of the straight-ticket

an independent candidate for Green Lake Township Trustee in Grand Traverse County. McDonald alleged that the straight-ticket ballot option gave candidates affiliated with a political party an advantage over candidates who were not affiliated with a political party; that the straight-ticket ballot option violated his constitutional right to equal protection under the Michigan and United States Constitutions; that the straight-ticket ballot option unduly burdened his federal constitutional right of free association; and that the straight-ticket ballot option violated the Michigan Constitution's guarantee of pure elections.

Accordingly, McDonald sought a declaratory judgment that Michigan's straight-ticket ballot option is unconstitutional, an injunction preventing the Grand Traverse County Board of Elections from putting the straight-ticket ballot option on the ballots for Green Lake Township, and a writ of mandamus compelling the Secretary of State to promulgate new rules to eliminate the straight-ticket ballot option on any ballot on which there are candidates who are not affiliated with a political party and directing the Grand Traverse County Election Commission not to include the straight-ticket ballot option on the ballots for Green Lake Township. Shortly thereafter, McDonald sought a preliminary injunction that the trial court denied.

In June of 2001, the trial court ordered the parties to submit a joint stipulation of facts (JSOF) and to file cross-motions for summary disposition. The parties' JSOF asserted that McDonald was an independent candidate for trustee in Green Lake Township on Novem-

---

ballot option, but does not cite the specific statute or statutes that he alleges are unconstitutional.

ber 7, 2000. According to the JSOF, there were two Green Lake Township trustee positions to be filled for which there were two Republican candidates, no Democratic candidates, and one independent candidate, McDonald. The two Republican candidates were elected as Green Lake Township trustees. One Republican candidate received 1,185 votes and the other received 1,175 votes. McDonald received 966 votes and therefore received 209 less votes than the second Republican who was elected.

According to the JSOF, 487 people voted the Republican straight-party ticket and 255 voted the Democratic straight-party ticket in the Green Lake Township elections on November 7, 2000. The JSOF further asserted that 106 voters voted the "No Party Affiliation" option in the straight-party-ticket section of the ballot. The JSOF also stated that candidates affiliated with a political party could receive votes either by a straight-party-ticket vote or by an individual vote, while candidates who were not affiliated with a political party listed on the ballot could not receive votes by a straight-party-ticket vote. Individuals who voted straight-party could split their ticket, however, and vote for candidates of another political party or independent candidates for any individual office. The JSOF further asserted that straight-party-ticket voting takes less time than voting for each office separately.

In accordance with the trial court's order, McDonald moved for summary disposition pursuant to MCR 2.116(C)(9) and (10), and defendants moved for summary disposition pursuant to MCR 2.116(C)(8) and (10). After a hearing, the trial court denied McDonald's motion for summary disposition and granted defendants' motion for summary disposition based on MCR 2.116(C)(10). In granting defendants' motion, the

trial court observed that there is no fundamental right to run for office or to be elected to office. The trial court further asserted that statutes that are nondiscriminatory and content-neutral are reviewed under a lenient standard, whereby the state only has to show some rational justification for the statute. The trial court noted that the state articulated several justifications for straight-ticket voting, including improving the speed and efficiency of elections, reducing the number of precinct personnel necessary, increasing voter turnout, and reducing voter apathy resulting from waiting in long lines to vote. Finally, the trial court concluded that the straight-ticket ballot option is constitutional. Although the trial court did not specifically address each of McDonald's constitutional arguments, McDonald asked the trial court if its ruling applied to all the grounds raised in the briefs, and the trial court responded that it did. McDonald now appeals.

## II. SUMMARY DISPOSITION; THE CONSTITUTIONALITY OF THE STATUTE

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's grant or denial of summary disposition.[2] This Court must review the record in the same manner as the trial court to determine whether the movant was entitled to judgment as a matter of law.[3] This Court reviews constitutional questions de novo on appeal.[4] Statutes

---

[2] *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).

[3] *Morales v Auto-Owners Ins Co*, 458 Mich 288, 294; 582 NW2d 776 (1998).

[4] *Tolksdorf v Griffith*, 464 Mich 1, 5; 626 NW2d 163 (2001).

are presumed to be constitutional, and "[e]very rea-
sonable presumption must be made in favor of consti-
tutionality."[5] The party asserting the constitutional
challenge has the burden of proof.[6]

### B. THE HISTORY OF THE STRAIGHT-TICKET BALLOT OPTION

Michigan has traditionally permitted a straight-
ticket ballot option, also known as a straight-party
option, which permits voters to pull a single lever,
punch a single chad, or make a single mark in the
partisan section of a ballot to vote for all candidates
of a particular party.[7] However, in 2001, the Michigan
Legislature enacted Public Act 269, which eliminated
the straight-ticket ballot option. The Michigan Consti-
tution gives the people "the power to approve or
reject laws enacted by the legislature, called the refer-
endum."[8] Pursuant to this referendum power, the
Democratic Party circulated petitions and obtained
enough signatures to invoke a referendum on 2001 PA
269. As a result of the referendum, Proposal 1
appeared on the general election ballot on November
5, 2002, and the people of the State of Michigan were
permitted to vote on whether 2001 PA 269, which
would, among other things, eliminate the straight-
ticket ballot option, should go into effect. 1,775,043
voters voted not to approve 2001 PA 269, and
1,199,236 voters voted to approve 2001 PA 269.
Because 2001 PA 269 was not approved by a majority
of the voters on November 5, 2002, it did not go into

---

[5] *Mahaffey v Attorney Gen*, 222 Mich App 325, 344; 564 NW2d 104
(1997).

[6] *Stevenson v Reese*, 239 Mich App 513, 517; 609 NW2d 195 (2000).

[7] See MCL 168.737.

[8] Const 1963, art 2, § 9.

effect. The law in effect before 2001 PA 269 was enacted, MCL 168.737, is thus still in effect today. Therefore, the straight-ticket ballot option is the law in Michigan. The question that McDonald poses is whether that law is constitutional.

### C. FREEDOM OF ASSOCIATION

#### 1. OVERVIEW

McDonald asserts that MCL 168.737 violates his First Amendment rights of freedom of association. Although freedom of association is not explicitly enumerated in the First Amendment, the United States Supreme Court has found it to be a right included within the "penumbra" of the First Amendment.[9] First Amendment guarantees are applicable to the states through the Due Process Clause of the Fourteenth Amendment.[10] A corollary of the right to associate is the right not to associate.[11] The freedom of association is not absolute, and the nature and degree of constitutional protection granted to the freedom of association may vary, depending on the extent to which constitutionally protected liberty is at stake in a given case.[12]

McDonald contends that because the straight-ticket ballot option implicates his fundamental right of freedom of association, the state must have a compelling

---

[9] *Griswold v Connecticut*, 381 US 479, 482-484; 85 S Ct 1678; 14 L Ed 2d 510 (1965).

[10] *Falk v State Bar of Michigan*, 411 Mich 63, 111; 305 NW2d 201 (1981).

[11] *California Democratic Party v Jones*, 530 US 567, 574; 120 S Ct 2402; 147 L Ed 2d 502 (2000).

[12] *Boy Scouts of America v Dale*, 530 US 640, 678; 120 S Ct 2446; 147 L Ed 2d 554 (2000).

interest to justify the constitutional intrusion. Generally, state action that infringes on First Amendment rights will only be tolerated when such infringement is unavoidably required to further a compelling, paramount, or vital state interest.[13] However, the United States Supreme Court has recognized that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently."[14] Accordingly, the United States Supreme Court has held that a less stringent level of review applies to state election laws that exact a "lesser burden" on an individual's right to freedom of association.[15] The United States Supreme Court explained the less stringent level of review, as well as the analytical process that a court should utilize in considering a First Amendment challenge to a state election law, in *Timmons*:

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the " 'character and magnitude' " of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's " 'important regulatory interests' " will usually

---

[13] *Falk, supra*, 411 Mich at 111-112.

[14] *Burdick v Takushi*, 504 US 428, 433; 112 S Ct 2059; 119 L Ed 2d 245 (1992).

[15] *Timmons v Twin Cities Area New Party*, 520 US 351, 358; 117 S Ct 1364; 137 L Ed 2d 589 (1997); *Anderson v Celebrezze*, 460 US 780, 789; 103 S Ct 1564; 75 L Ed 2d 547 (1983); *Burdick, supra*.

be enough to justify " 'reasonable, nondiscriminatory restrictions.' "[16]

### 2. McDonald's Assertions

Under the framework first established by the United States Supreme Court in *Anderson*, the initial step in assessing whether the straight-ticket ballot option unconstitutionally burdens McDonald's fundamental right to association is to assess the character and magnitude of the injury to his First Amendment rights. McDonald asserts that the straight-ticket ballot option impermissibly burdens his right to associate because candidates affiliated with a political party obtain benefits from the straight-ticket ballot option that he, as an independent candidate, does not. According to McDonald, his freedom of association is implicated because the freedom of association includes the freedom not to associate, and he could only obtain the benefits of the straight-ticket ballot option if he associated with and became the nominee of one of the political parties listed on the ballot in the straight-party-ticket-voting section.

McDonald specifically contends that, as an independent candidate, he did not receive five benefits of the straight-ticket ballot option. First, McDonald argues that the straight-ticket ballot option was unavailable for independent candidates and that, as an independent candidate, he was deprived of straight-ticket votes from voters who would have voted straight-ticket independent if they had the opportunity to so

---

[16] *Timmons, supra* at 358, quoting *Burdick, supra* at 434, quoting *Anderson, supra* at 788-789 (internal citations omitted).

vote. Second, McDonald argues that party candidates could receive votes in two locations on the ballot (at the top of the ballot via the straight-ticket ballot option and at the bottom of the partisan ballot, where the individual office of township trustee was located), while he could only receive votes in one location on the ballot (at the bottom of the partisan ballot where the individual office of township trustee was located). Third, McDonald contends that he was disadvantaged because party candidates could receive a vote at the top of the ballot, while he could only receive a vote in the township trustee section of the ballot, which was located below the top of the ballot (actually, the township trustee office which McDonald was seeking was the last office on the partisan section of the ballot). Fourth, McDonald contends that because "a significant portion" of straight-ticket voters would proceed directly to the nonpartisan section of the ballot, he was deprived of "potential name recognition" and the opportunity to receive votes from "voters opposed to the party of the Plaintiff's rival candidates." Fifth, McDonald contends that the straight-ticket ballot option immunizes candidates associated with the major political parties from "roll-off," which occurs when voters cast votes for high profile offices but fail to vote for the "lesser" offices further down on the ballot.

### 3. THE BURDEN ON McDONALD'S ASSOCIATIONAL RIGHTS

We conclude that the straight-ticket ballot option places only a "lesser burden" as opposed to a "severe

burden" on McDonald's associational rights.[17] The
essence of each of the benefits of the straight-ticket
ballot option that McDonald claims he was denied as
a result of his independent status concerns the ease
with which voters could cast their vote for him. As a
result of McDonald's decision not to associate with a
political party, voters who wanted to vote for him for
township trustee were required to spend more time
and make a greater effort to vote for him than voters
who simply voted straight-ticket. However, even
straight-ticket voters were not prohibited from split-
ting their ticket and voting for a candidate of another
party or an independent candidate for any of the par-
tisan offices. Because the straight-party ballot option
did not prevent or prohibit straight-ticket voters from
splitting their tickets and voting for McDonald and
because any voter who desired to vote for McDonald
could do so if the voter took the time and made the
effort, we conclude that the nature of the burden on
McDonald's associational rights was not severe
enough to warrant strict-scrutiny review.[18]

#### 4. THE STATE'S INTERESTS

The second step of the *Anderson* test requires this
Court to identify and evaluate Michigan's interests
that would justify imposing this lesser, but nonethe-
less identifiable, burden on McDonald's First Amend-
ment associational rights. Because the straight-ticket
ballot option did not impose a severe burden on
McDonald's associational rights, it passes constitu-

---

[17] For a discussion on assessing the severity of the burden, see *Citizens
for Legislative Choice v Miller*, 144 F3d 916 (CA 6, 1998).

[18] See *Timmons, supra* at 363.

tional muster if the state has "important regulatory interests" to justify it.[19] In its brief on appeal, the state identifies many interests that it seeks to further by permitting the straight-ticket ballot option. One of the interests identified by the state in support of the straight-ticket ballot option includes the state's power to regulate elections in order to maintain and protect the integrity of the democratic system. According to the state, "the option of voting a straight ticket speeds the voting process and reduces the amount of voting machines, polling places, and personnel necessary to facilitate elections." The state further asserts that if the voting process is easy and expedient, people will be more likely to exercise their right to vote. In addition, the state asserts that "the ability to vote a straight ticket provides a clear and simple option for voters who may otherwise be confused by the array of offices and candidates." Finally, the state asserts that it has a strong interest in protecting the stability of its political system.

The interests that the state articulates are "important regulatory interests."[20] In *Timmons*, the United States Supreme Court recognized that a state "certainly ha[s] an interest in protecting the integrity, fairness, and efficiency of [its] ballots and election processes as means for electing public officials."[21] The United States Supreme Court also recognized in *Timmons* that a state also has a "strong interest" in the stability of its political systems.[22] In addition, the Michigan Supreme Court has classified as "compel-

---

[19] *Anderson, supra* at 788.

[20] *Id.*

[21] *Timmons, supra* at 364.

[22] *Id.* at 366.

ling" the state's interest in the protection of the integrity of its election process.[23]

### 5. BALANCING THE INTERESTS

The final step of the *Anderson* test requires this Court to balance the character and magnitude of the constitutional injury to McDonald against the state's interests. We conclude that the state's compelling interest in the integrity of the election process and strong interest in the stability of its political systems outweigh the burden on McDonald's First Amendment right to freedom of association. The imposition of even substantial restrictions on the right to associate does not automatically invalidate a statute that has that effect.[24] States must be permitted to enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.[25] " '[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.' "[26] Moreover, the state's interest in the stability of its political systems permits it "to enact reasonable election regulations that may, in practice, favor the traditional two-party system."[27] "[W]hile an interest in securing the perceived benefits of a stable two-party system will not justify unreasonably exclusionary restrictions, . . .

---

[23] *Socialist Workers Party v Secretary of State*, 412 Mich 571, 589; 317 NW2d 1 (1982).

[24] *Storer v Brown*, 415 US 724, 729; 94 S Ct 1274; 39 L Ed 2d 714 (1974).

[25] *Timmons, supra* at 358.

[26] *Burdick, supra* at 433, quoting *Storer, supra* at 730.

[27] *Timmons, supra* at 367.

[s]tates need not remove all of the many hurdles third parties face in the American political arena today."[28]

In conclusion, the straight-ticket ballot option, which does not impose a severe burden on McDonald's constitutional rights to freedom of association, is justified by the state's compelling interest in the integrity of the election process and its strong interest in the stability of its political systems. The straight-ticket ballot option therefore did not deprive McDonald of his First Amendment right to freedom of association.

### D. EQUAL PROTECTION

#### 1. OVERVIEW

McDonald asserts that MCL 168.737 violates his right to equal protection of the law. The Equal Protection Clauses of the United States and Michigan Constitutions provide that no person shall be denied the equal protection of the law.[29] The Michigan Supreme Court has held that Michigan's equal-protection provision is coextensive with the Equal Protection Clause of the United States Constitution.[30]

McDonald argues that the straight-ticket ballot option denied him equal protection under the United States and Michigan Constitutions, and that because the straight-ticket ballot option also burdens his First Amendment right of freedom of association, this Court must analyze its constitutionality using strict scrutiny. According to McDonald, the straight-ticket

---

[28] *Id.* (citation omitted).

[29] US Const, Am XIV; Const 1963, art 1, § 2.

[30] *Crego v Coleman*, 463 Mich 248, 258; 615 NW2d 218 (2000), cert den 531 US 1074 (2001).

ballot option is unconstitutional because the state does not have a compelling state interest to justify it, and the state has not used means that are narrowly tailored to advance any state interests.

### 2. "INVIDIOUS DISCRIMINATION"

Initially, we must address whether the alleged discrimination in this case is the type of discrimination proscribed by the United States and Michigan Constitutions. As the United States Supreme Court observed in *American Party of Texas v White*,[31] " '[s]tatutes create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution.' "[32] This Court has also recognized that " 'United States Supreme Court precedents consistently indicate that the United States Constitution's Equal Protection Clause reaches only intentional or purposeful discrimination.' "[33] A plaintiff alleging an equal-protection violation has the "burden . . . to demonstrate in the first instance a discrimination against them of some substance."[34]

We conclude that the discrimination that McDonald alleges in this case is not the sort of invidious, intentional, or purposeful discrimination that is proscribed by the Equal Protection Clause of the United States Constitution and the equal-protection provision in the

---

[31] *American Party of Texas v White*, 415 US 767, 781; 94 S Ct 1296; 39 L Ed 2d 744 (1974).

[32] *Id.*, quoting *Ferguson v Skrupa*, 372 US 726, 732; 83 S Ct 1028; 10 L Ed 2d 93 (1963).

[33] *Vorva v Plymouth-Canton Community School Dist*, 230 Mich App 651, 659; 584 NW2d 743 (1998), quoting *Harville v State Plumbing & Heating, Inc*, 218 Mich App 302, 306; 553 NW2d 377 (1996).

[34] *American Party of Texas, supra* at 781.

Michigan Constitution. The distinction that the statutes providing for straight-ticket voting make is between candidates for public office who are running as candidates for a particular party and candidates for public office who are running as independents with no party affiliation. Voters cannot vote for independent candidates using the straight-ticket vote. The nature of the discrimination against McDonald, then, is that voters desiring to vote for him must spend more time and make a greater effort to vote for him, while candidates affiliated with a party can receive a vote more quickly and easily from voters who vote straight-ticket.

However, the straight-ticket ballot option did not prevent straight-ticket voters from splitting their ticket and also voting for McDonald. Accordingly, any voter desiring to vote for him could have done so. This distinction is not the type of invidious discrimination proscribed by the Equal Protection Clause. Moreover, we see no evidence that the Legislature, in enacting the election laws in Michigan, intentionally or purposefully discriminated against independent candidates, nor does McDonald provide anything to indicate that the Legislature had such an intent.

### 3. RATIONAL BASIS VERSUS STRICT SCRUTINY

We note, further, that the constitutional validity of the straight-ticket ballot system must be analyzed using the rational-basis analysis, not the more stringent strict-scrutiny analysis. McDonald contends that because the alleged equal-protection violation also affects a fundamental right, the freedom of association, this should elevate the level of scrutiny to strict

scrutiny requiring a compelling state interest with means narrowly tailored to advance that interest.

McDonald is correct that the general rule is that the strict-scrutiny test must be used to analyze an equal-protection claim where the legislation at issue also affects a fundamental interest.[35] However, in *Socialist Workers Party*,[36] where the challenged statute also burdened the plaintiffs' fundamental right of association, the Michigan Supreme Court held that "[i]n an equal protection challenge to a ballot-restricting statute, plaintiffs have the burden of demonstrating a discrimination 'of some substance' before the compelling state interest test is triggered." In addition, although *Anderson* involved a constitutional challenge based solely on the First Amendment, other courts have held that the *Anderson* test also applies to equal-protection challenges.[37]

We conclude that McDonald has not met his burden of demonstrating discrimination "of some substance" to trigger strict scrutiny and require the state to articulate a compelling state interest.[38] As noted previously, it was more difficult and time consuming for voters to vote for McDonald because he was an independent candidate. However, we observed that the increased difficulty for voters desiring to vote for McDonald was minimal. Moreover, Michigan election law did not prohibit straight-ticket voters from split-

---

[35] *Vargo v Sauer*, 457 Mich 49, 60; 576 NW2d 656 (1998).

[36] *Socialist Workers Party, supra* at 589.

[37] See *Green v Mortham*, 155 F3d 1332, 1337 n 10 (CA 11, 1998); *Rosen v Brown*, 970 F2d 169, 177-178 (CA 6, 1992).

[38] Even if we were to conclude that strict scrutiny applies to the straight-ticket ballot option, the Supreme Court has stated that the state has a "compelling interest . . . in the protection of the integrity of its election process." *Socialist Workers Party, supra* at 589.

ting their ticket and voting for McDonald in the township trustee portion of the ballot. Thus, the ballot did not prevent McDonald from receiving votes from any voter who wanted to vote for him. Accordingly, any discrimination against McDonald was not of sufficient substance to trigger strict-scrutiny review.

Moreover, the standard articulated in *Anderson* applies to McDonald's equal-protection claim, notwithstanding the fact that the straight-ticket ballot option also implicates his First Amendment right of freedom of association. For the same reasons as those we outlined above, the straight-ticket ballot option did not deprive McDonald of equal protection under the United States and Michigan Constitutions.

### E. PURITY OF ELECTIONS

#### 1. OVERVIEW

McDonald argues that the straight-ticket ballot option violates the "purity of elections" clause of the Michigan Constitution.[39] The Michigan Constitution provides that "[t]he legislature shall enact laws to . . . preserve the purity of elections."[40] The Michigan Supreme Court has interpreted the "purity of elections" clause to embody two concepts: "first, that the constitutional authority to enact laws to preserve the purity of elections resides in the Legislature; and second, 'that any law enacted by the Legislature which adversely affects the purity of elections is constitutionally infirm.' "[41] The phrase "purity of elections"

---

[39] Const 1963, art 2, § 4.

[40] *Id.*

[41] *Socialist Workers Party, supra* at 596, quoting *Wells v Kent Co Bd of Election Comm'rs*, 382 Mich 112, 123; 168 NW2d 222 (1969).

does not have a single precise meaning.[42] However, "it unmistakably requires . . . fairness and evenhandedness in the election laws of this state."[43]

According to McDonald, the straight-ticket ballot option violates the "purity of elections" clause because his opponents, who were affiliated with the Republican Party, had the opportunity to receive votes at the top of the voting ballot if voters exercised their straight-ticket voting option, while he could only receive a vote at the bottom of the partisan voting ballot. McDonald argues that this was unfair because candidates affiliated with a political party were "immunized" from voter roll-off, while he was not.

### 2. ELLIOTT

In support of his argument, McDonald cites *Elliott v Secretary of State*.[44] In *Elliott*, the Michigan Supreme Court held that election officials had a duty to rotate the names of candidates for Supreme Court Justice because candidates "whose names appear at the head of the list have a distinct advantage."[45] The Supreme Court further stated, "[i]t is not consistent with fairness or purity of elections or the avoidance of misuse of elective franchise for election officials to prepare ballots in such a condition as will afford one candidate or nominee an unfair advantage over rival candidates or nominees."[46] The Supreme Court again

---

[42] *Wells, supra* at 123.

[43] *Socialist Workers Party, supra* at 598.

[44] *Elliott v Secretary of State*, 295 Mich 245; 294 NW 171 (1940).

[45] *Id.* at 249.

[46] *Id.* at 249-250.

emphasized the importance of candidates being treated equally in *Wells*,[47] where it stated that "one of the primary goals of election procedures is to achieve equality of treatment for all candidates whose names appear upon the ballot."

We conclude, however, that McDonald's reliance on *Elliott* is misplaced because that case is factually distinguishable from this case, and the holding is not as broad as McDonald suggests. In *Elliott*, the plaintiff was a candidate for the office of Justice of the Michigan Supreme Court. The plaintiff argued that the "purity of elections"[48] clause required elections officials to rotate the plaintiff's name with the names of the other nominees on the ballot. The Supreme Court held that the "purity of elections" clause required election officials to "rotate on the nonpartisan ballots the names of candidates for the office of Justice of the Supreme Court . . . ."[49]

The holding in *Elliott* that it was unfair to have one candidate's name appear at the head of the list is limited to candidates for the "same office" and does not stand for the proposition, as McDonald suggests, that a ballot is unfair in general if it permits one candidate for an office to receive votes at the top and bottom of the ballot, while other candidates can only receive votes at the bottom of the ballot. We therefore reject McDonald's attempt to extend or expand the holding in *Elliott* to the facts of this case.

---

[47] *Wells, supra* at 123.

[48] In *Elliott*, the Michigan Supreme Court interpreted the "purity of elections" clause in the 1908 Michigan Constitution, which provided: "Laws shall be passed to preserve the purity of elections and guard against abuses of the elective franchise." Const 1908, art 3, § 8.

[49] *Elliott, supra* at 250.

3. THE "PURITY OF ELECTIONS" CLAUSE

Further, we conclude that the straight-ticket ballot option does not violate the "purity of elections" clause in the Michigan Constitution. In *Jacobs v Headlee*,[50] this Court held that the Michigan campaign financing and practices act did not violate the "purity of elections" clause because it was "based on legitimate governmental objectives" and did not provide "any *unfair advantage* to major party candidates."[51] Similarly, the straight-ticket ballot option in this case does not create an unfair advantage to candidates affiliated with a political party. The benefit of the straight-ticket ballot option is that it makes it easier and faster for some voters to vote. Although the straight-ticket ballot option benefits candidates affiliated with a political party by making it easier for voters to vote for those candidates, such a benefit does not afford an *unfair advantage* to the candidates affiliated with a political party. The advantage here is only minimal; the straight-ticket ballot option does not prevent or prohibit any voter from voting for the candidate of the voter's choice. We observe that voters not voting a straight ticket could have voted for McDonald by selecting his name in the township-trustee section of the partisan ballot while straight-ticket voters who desired to vote for McDonald could have split their ticket and voted for him for township trustee.

The United States Supreme Court has stated that a state's interest in the stability of its political system "permits them to enact reasonable election regula-

---

[50] *Jacobs v Headlee*, 135 Mich App 167, 177; 352 NW2d 721 (1984).

[51] *Id.* (emphasis in original).

tions that may, in practice, favor the traditional two-party system."[52] The straight-ticket ballot option minimally favors candidates who are affiliated with a political party, but it does not give them an *unfair* advantage; again, any voter who wanted to vote for McDonald for township trustee could have done so. Moreover, the straight-ticket ballot option is "based on legitimate governmental objectives" because the state has a "compelling" interest in the protection of the integrity of its election process,[53] and a strong interest in the stability of its political systems.[54] Therefore, we conclude that the straight-ticket ballot option did not provide an unfair advantage to major-party candidates and did not violate the "purity of elections" clause of the Michigan Constitution.

## F. CONCLUSION

We conclude that the straight-ticket ballot option was constitutional and did not deprive McDonald of his First Amendment associational rights or his equal protection rights under the United States and Michigan Constitutions. Further, the straight-ticket ballot option did not violate the Michigan Constitution's "purity of elections" requirement. Accordingly, defendants were entitled to judgment as a matter of law, and the trial court did not err in granting their motion for summary disposition.

---

[52] *Timmons, supra* at 367.

[53] *Socialist Workers Party, supra* at 589.

[54] *Timmons, supra* at 366.

### III. DISCOVERY SANCTIONS; COSTS AND ATTORNEY FEES

#### A. STANDARD OF REVIEW

McDonald argues that the trial court abused its discretion in refusing to impose discovery sanctions on defendant Secretary of State based on the Secretary of State's failure to answer plaintiff's interrogatories 29 and 33 as required by the trial court's order. McDonald also argues that the trial court clearly erred in awarding the Secretary of State attorney fees, and abused its discretion in awarding the Secretary of State costs. This Court reviews a trial court's imposition of discovery sanctions for an abuse of discretion.[55] This Court reviews a trial court's decision to award attorney fees for clear error and reviews the award itself for an abuse of discretion.[56] This Court reviews an award of costs for an abuse of discretion.[57]

#### B. MCDONALD'S INTERROGATORIES AND THE SECRETARY OF STATE'S RESPONSE

The language of McDonald's interrogatories 29 and 33 is as follows:

> 29. Does the straight party ticket option provide any advantage whatsoever in elections to party affiliated candidates whose parties are listed in the straight party ticket section of the ballot over rival candidates who cannot be voted for by means of the straight party ticket option? If

---

[55] *Bass v Combs*, 238 Mich App 16, 26; 604 NW2d 727 (1999).

[56] *Michigan Ed Employees Mut Ins Co v Turow*, 242 Mich App 112, 118; 617 NW2d 725 (2000).

[57] *Kernan v Homestead Dev Co*, 252 Mich App 689, 691; 653 NW2d 634 (2002).

yes, please describe the nature of each and every advantage?

\*     \*     \*

33. Are you aware of any data and/or information that in any way tends to indicate that the straight party ticket voting option is unfair, and/or in any way works to the advantage of the larger political parties? If so please fully identify the source of the data and/or information, including the name and address of the source, and provide copies of the data and information.

On May 2, 2001, McDonald filed a motion to compel defendants to answer his interrogatories. On May 6, 2001,[58] the Secretary of State responded to McDonald's interrogatories. In response to interrogatory 29, the Secretary of State replied, "[t]he Secretary of State does not answer this question, because it calls for a legal conclusion and thus no answer is required, and because there is no data to support the underlying assumptions contained in the question." The Secretary of State responded to interrogatory 33 as follows: "The Secretary of State is unable to answer this question because it is unduly burdensome, as the requested data is not available and could not be obtained with reasonable effort."

C. THE TRIAL COURT'S RULING

At the hearing on McDonald's motion to compel discovery, McDonald asked the trial court to compel the Secretary of State to answer interrogatories 29

---

[58] The court clerk mistakenly stamped May 6, 2002, on the Secretary of State's responses to McDonald's interrogatories. The year the Secretary of State's responses to McDonald's interrogatories were filed was 2001.

and 33, as well as other interrogatories. At the hearing, the trial court stated:

> It would seem to the Court either the information exists and statistical compilations that [sic] are readily available to you or any other citizen in or out of the lawsuit under the Freedom of Information Act; or, you are asking a party to do expert witness work for you, which they have no obligation to do.
>
> If the data isn't compiled in the fashion you want, if there aren't statistics on the things which you are interested, it's not your opponent[']s obligation to do statistical studies, but you to retain an expert and do the discovery yourself.

The trial court then specifically refused to order the Secretary of State to respond to discovery requests that required it to do research or perform statistical studies, but did order the Secretary or State to answer interrogatories that could be answered "yes," "no," or "I don't know." Thereafter, the trial court entered an order requiring the Secretary of State to respond to McDonald's interrogatories 21, 22, 23, 24, 26, 28, 29, 32, and 33, by May 14, 2001, if those interrogatories could be answered with a yes or no answer. According to the Secretary of State, she complied with the trial court's discovery order by including responses to McDonald's interrogatories in the parties' joint stipulation of facts, and she was therefore not required to serve McDonald with answers to interrogatories if the interrogatories could not be answered with a yes or no.

McDonald then moved for discovery sanctions, arguing that the Secretary of State failed to comply with the trial court's discovery order. After a hearing, the trial court denied McDonald's motion for discov-

ery sanctions and granted the Secretary of State's motion for costs and attorney fees, stating:

> Whether or not there was room for additional discovery within that set of parameters is neither here nor there because specific issues raised here were the subject of an earlier motion where the Court did in fact rule, correctly or incorrectly, that these interrogatories did seek to have statistical work and research done by the Secretary of State. This is the type of work that if someone wishes to pursue these points in litigation it's typically their responsibility to hire their own expert, whether he or she be political scientists or a statistician.
>
> *    *    *
>
> I'm not sure what the purpose is here, Mr. McDonald, I won't ascribe it to bad faith but it is a redundant motion. These interrogatories were answered, this is not a motion to—this is not a motion that legitimately tested the nature of those answers.
>
> In view of the prior Court ruling and specific direction to the Secretary of State as to how to answer these, the motion is denied.
>
> And, I am going to have the Attorney General, taxpayers of Michigan, compensated for his mileage up here and six hours of time; I drive to Lansing often enough to know that you can't do that in less than that, or you shouldn't.

D. DISCOVERY SANCTIONS

We conclude that the trial court did not abuse its discretion in denying McDonald's motion for discovery sanctions. Interrogatories 29 and 33 clearly could not be answered with a simple yes or no response. Accordingly, the Secretary of State did not violate the trial court's order requiring her answer those interrogatories that could be answered with a yes or no

response, and the trial court did not abuse its discretion in denying McDonald's motion for discovery sanctions.

### E. FEES AND COSTS

In addition, we conclude that the trial court did not clearly err in awarding attorney fees to the Secretary of State, and did not abuse its discretion in awarding costs to defendant Secretary of State. The trial court awarded the Secretary of State $99.18 in costs to cover mileage and $900 in attorney fees. Generally, attorney fees are not recoverable unless expressly authorized by statute, court rule, or common-law exception.[59] Here, the trial court did not articulate a statutory basis or court rule to justify awarding attorney fees on the record at the hearing or in its order awarding costs and attorney fees. However, at the hearing on the parties' cross-motions for summary disposition, McDonald asked the trial court on what basis it had awarded costs, and the trial court stated that it awarded costs to the Secretary of State pursuant to MCR 2.114.

The trial court's award of attorney fees and costs to defendant based on MCR 2.114 was appropriate. MCR 2.114(D) and (E) provide:

*(D) Effect of Signature.* The signature of an attorney or party, whether or not the party is represented by an attorney, constitutes a certification by the signer that

(1) he or she has read the document;

(2) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well

---

[59] MCL 600.2405(6); *Terra Energy, Ltd v Michigan,* 241 Mich App 393, 397; 616 NW2d 691 (2000).

grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and

(3) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

*(E) Sanctions for Violation.* If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages.

Here, the discovery order did not require the Secretary of State to answer interrogatories 29 and 33 because they clearly could not be answered with a yes or no answer. McDonald's motion for discovery sanctions based on the Secretary of State's alleged failure to comply with the trial court's discovery order therefore was not well grounded in fact or warranted by existing law. Accordingly, the trial court did not clearly err in awarding attorney fees to the Secretary of State under MCR 2.114(E), and did not abuse its discretion in awarding the Secretary of State costs under MCR 2.114(E).

Affirmed.