*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MALINDA PEGO, ALI HOSSEIN, HASSAN NEHME, ANNE DELISLE, also known as ANN DELISLE, JESSICA BAREFIELD, NORM SHINKLE, also known as NORM SCHINKLE, and WARREN CARPENTER,

Plaintiffs-Appellees,

v

KRISTINA KARAMO,

Defendant-Appellant.

FOR PUBLICATION
November 22, 2024
1:07 PM

No. 371299
Kent Circuit Court
LC No. 24-000658-CZ

Before: GADOLA, C.J., and SWARTZLE and LETICA, JJ.

PER CURIAM.

In this dispute over control of the Michigan Republican State Committee (the State Committee), defendant, Kristina Karamo, appeals by right the trial court's order granting summary disposition in favor of plaintiffs Malinda Pego, Ali Hossein, Anne DeLisle, Jessica Barefield, Norm Shinkle, and Warren Carpenter. The court also permanently enjoined Karamo from representing herself as the State Committee's chairperson and from taking certain specified actions involving the State Committee, its property, and its communications. On appeal, Karamo claims that: (1) the trial court lacked the authority to resolve the dispute between the State Committee's members because the dispute was political; (2) plaintiffs did not have standing to bring their claims; (3) the trial court erred when it refused to apply the law applicable to actions in quo warranto to plaintiffs' complaint; (4) the trial court erred when it granted injunctive relief; and (5) the trial court erred when it decided the issue on a motion for summary disposition. Because we conclude that Karamo has not identified any errors that warrant relief, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

The State Committee is the central committee, as designated under MCL 168.597, for the Republican Party in Michigan, and it operates under the official name of Michigan Republican Party. The State Committee's bylaws provide that the Michigan Republican Party is "essentially

-1-

comprised of the following party committees": the State Committee, the "congressional district committees," and the "county executive committees." The bylaws, however, make it clear that the State Committee "works in cooperation with" the other party committees, which remain independent for purposes of fundraising and election law.

In February 2023, the Republicans held a spring convention and elected new committee members for their congressional committees and the State Committee. The convention delegates also elected Karamo to be the State Committee's chairperson. According to Daniel Hartman, who became the State Committee's general counsel in May 2023,[1] the established party members immediately had conflicts with Karamo and began working against her. Hartman testified that one member, Bree Moeggenberg, gathered signatures from members seeking to remove Karamo as chairperson at the leadership conference held on Mackinac Island in 2023.

Hartman indicated that the State Committee was to have an in-person meeting on December 2, 2023, but it was changed to a virtual meeting. The State Committee could not act at that meeting because it was unable to achieve a quorum. He concluded that members were virtually present in the "background," but did not officially participate. Under the circumstances, Hartman opined that it was obvious that Karamo's opposition had formed a "shadow party."

On December 2, 2023, Moeggenberg sent an e-mail to Karamo, which she apparently copied to all the members of the State Committee. Moeggenberg wrote that she was requesting a special meeting as allowed under the State Committee's bylaws. She called for the meeting to be held on December 27, 2023, at a specific location and time, and identified the agenda items as: "Transparency, Accountability, Unity, Proposed Bylaw Amendment, review and possible removal of Kristina Karamo, Dan Hartman, Robert Owens and Jim Copas." Moeggenberg also named the members who would preside over the meeting and attached the signatures of 39 members of the State Committee who supported the request.

The State Committee's bylaws require a chairperson to call a special meeting upon the written request of one-third of the members within 15 days of the filing of the request with the chair. If the chair does not call the special meeting requested by one-third or more of the members within 15 days of the request, "any such member can give notice five (5) days before such meeting."

Anne DeLisle, who was the Chair for the 8th Congressional District and a member of the State Committee, testified that Karamo responded to the request on December 5, 2023, by opining that the request was invalid. Hartman concluded that the request for a special meeting was invalid on a variety of grounds. In particular, he opined that the request improperly included on the agenda the removal of Karamo without a petition signed by a majority of the State Committee's members, as required under the State Committee's bylaws. Notwithstanding his reservations, he advised

---

[1] Our factual summation is derived from the testimony elicited during the preliminary injunction evidentiary hearing as well as the evidence submitted with the briefs addressing the motion for summary disposition.

Karamo that the request was probably adequate to compel her to call a special meeting, but without conceding to the agenda, the location, the date, or the presiding personnel.

On December 16, 2023, Karamo had the State Committee's secretary, Angela Gillisse, provide notice of a special meeting to be held on January 13, 2024. But the notice did not contain the agenda items called for by the committee members who made the request on December 2, 2023. Gillisse testified that she did not include removing Karamo in the agenda because the persons who requested the special meeting did not submit a petition to remove Karamo, which Gillisse opined was a prerequisite to warrant placement of that issue on the agenda.

The members who sought the special meeting on December 2, 2023, took the position that Karamo's proposed special meeting for January 13, 2024, did not constitute a proper response to their request because she did not include their agenda items. For that reason, Moeggenberg sent notice by e-mail to the members that she was calling a special meeting for January 6, 2024. The notice included all the items listed on the agenda in the request for a special meeting from December 2, 2023.

At the meeting held on January 6, 2024, DeLisle and the other members posited that the bylaws did not require that a petition for removal of an officer be filed before a meeting could be called that included officer removal as an agenda item. Nevertheless, the persons attending the meeting on January 6, 2024, realized that they had not yet filed a petition to remove Karamo before the meeting began. Two attorneys and the State Committee's cochair, Melinda Pego, collected signatures for a petition. And, Matt DePerno, who was not a member of the State Committee, sent the compiled petition to Gillisse and Karamo at 1:49 p.m. on January 6, 2024.

Because Gillisse, the State Committee's secretary, was not present at the January 6, 2024 meeting, the attending members selected DeLisle to serve as the secretary pro tem. DeLisle took the meeting minutes. DeLisle stated that the meeting formally began at 1:59 p.m. and that 45 members of the State Committee appeared in person. Another 26 members appeared by proxy.

DeLisle testified that the January 6, 2024 meeting, had a quorum because more than 54 members of the State Committee were present in person or through proxies. DeLisle related that, during the meeting, there was a motion to remove Karamo as the State Committee's chairperson, and the motion was seconded. The bylaws state that an officer can only be removed "upon a seventy-five percent (75%) vote of the Committee present and voting at any meeting of the Committee, provided there is a quorum present, and such seventy-five percent (75%) vote must be made in person by such members and not by proxy." For that reason, DeLisle stated that only the 45 members who were present without a proxy voted. Of them, 40 members voted to remove Karamo, which amounted to 88.89% of the members voting and present. In that way, DeLisle opined, the State Committee removed Karamo and Pego became the acting chair.

On January 8, 2024, Pego sent out a notice canceling the special meeting scheduled for January 13, 2024. Karamo, however, did not accept that the meeting scheduled for January 13, 2024, had been canceled. On January 9, 2024, Karamo sent out an e-mail in which she wrote that she had instructed the secretary to add whether she would remain the chair to the agenda for the special meeting to be held on January 13, 2024. On January 11, 2024, Gillisse sent an e-mail with the updated agenda for the special meeting to be held on January 13, 2024. That same day, Pego

sent out an e-mail noticing a different special meeting to be held on January 20, 2024, to elect officers, a new chairperson, and a new general counsel.

The January 13, 2024 meeting minutes reflect that the State Committee's Policy Committee offered its opinion to the present members that the meeting held on January 6, 2024, was invalid. The members also heard accusations that State Committee members, Pego, Andy Sebolt, Moeggenberg, Tim Ross, DeLisle, J.D. Glaser, and Dan Lawless, had all violated the conflict-of-interest prohibition under the State Committee's bylaws. The members voted to uphold the determinations that those members had violated the conflict rules and that the January 6, 2024 meeting was invalid. The members also voted not to remove Karamo as chairperson.

Plaintiffs sued Karamo on January 19, 2024, alleging that her refusal to acknowledge that she had been removed on January 6, 2024, was causing confusion and harm to the State Committee. They asked the trial court to declare that Karamo had been properly removed on January 6, 2024, and that she breached the bylaws, which constituted a binding contract on the members, through her actions. They further sought a declaration that the State Committee's bylaws were validly amended on January 6, 2024, to reduce the percentage of votes necessary to remove an officer.

DeLisle attended the special meeting called for January 20, 2024. Because Gillisse did not attend that meeting, DeLisle acted as the secretary pro tem for that meeting and took the minutes. DeLisle stated that a quorum was present for that meeting and the State Committee elected Ambassador Peter Hoekstra to be the State Committee's new chairperson.

Plaintiffs moved for a preliminary injunction on January 24, 2024. They asked the trial court to prohibit Karamo from holding herself out as the State Committee's chair; from calling any meeting of the State Committee; from filing or causing to be filed any report or documentation required by state or federal law; from accessing any postal boxes held by the State Committee; from conducting business in the State Committee's name, which included sending e-mails in the name of the State Committee; and from engaging in any communication that purported to be from the State Committee.

The trial court held an evidentiary hearing over three days to address whether to issue a preliminary injunction. After the close of proofs, it determined that the meeting held on January 6, 2024, had been properly called and met the requirement for a quorum. The court stated that the bylaws were silent on the timing of the petition required for a vote to remove an officer and it concluded that filing the petition immediately before the meeting satisfied the requirements of the bylaws. The trial court also determined that the members who met at the January 6, 2024 meeting validly removed Karamo. After addressing the factors governing whether to grant a preliminary injunction, the trial court determined that it was appropriate to enter the requested preliminary injunction, which it did on February 27, 2024.

On April 19, 2024, plaintiffs moved for summary disposition under MCR 2.116(C)(10). They argued that the undisputed facts showed that they were entitled to the relief that they requested in their complaint.

-4-

Karamo responded by arguing that there were questions of fact as to whether the members who sought a special meeting on December 2, 2023, made a valid request. She also maintained that she met the condition of calling a special meeting by scheduling a meeting for January 13, 2024. There was, she alleged, nothing in the bylaws that the agenda include the items requested by the members on December 2, 2023. She also argued that there were questions of fact about the notice for the meeting held on January 6, 2024, and its validity. For all these reasons, she asked the trial court to deny the motion.

After a two-day hearing on the motion for summary disposition, the trial court determined that plaintiffs had established their right to relief concerning the removal of Karamo. The court recognized that there was also a claim involving whether plaintiffs validly amended the bylaws at the meeting held on January 6, 2024. It denied the motion as to that claim.

The trial court then addressed whether there were fact questions. It stated that the bylaws were clear: once a third of the State Committee's members requested a special meeting on whether to remove Karamo, she had to call that meeting, but she did not. For that reason, the requesting members could call it themselves. The trial court disagreed that, because the request included elements that were not permissible, it invalidated the entire request. The court stated that the notice was also adequate, notwithstanding that it was not done by mail. The court disagreed that there was a question of fact about the signatures in the petition. The court held that the petition needed only 50 plus signatures, which it had, and only needed to be sent before the vote was called, which it was. The court determined that the voting members were the members for purposes of determining a quorum, and the quorum at the meeting of January 6, 2024, removed Karamo by more than 75% of the members voting in person. The court stated that it would grant the relief because it involved questions of law.

The trial court entered its order granting plaintiffs' motion for summary disposition on June 11, 2024. It declared that Karamo was validly removed on January 6, 2024, and it declared void any action that Karamo purported to take on behalf of the State Committee after that point. As part of its order, the court restated the preliminary injunctions as permanent injunctions. The court further stated that its order was the final order because plaintiffs withdrew their request for declaratory relief involving the amendment of the bylaws. Karamo now appeals by right.

## II. JUSTICIABILITY

## A. STANDARD OF REVIEW

Karamo first asserts that the trial court had no authority to consider the complaint at issue because it was nonjusticiable, a purely intraparty political dispute, which courts may not resolve. For that reason, she argues the trial court erred when it refused to dismiss the complaint on her motion for summary disposition.

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Bakeman v Citizens Ins Co of the Midwest*, 344 Mich App 66, 73; 998 NW2d 743 (2022). Questions of constitutional law and issues of statutory interpretation are also reviewed de novo. *In re Application Consumers Energy Co for Gas Cost Recovery*, 345 Mich App 66, 84; 3 NW3d 853 (2022) (citations omitted). Similarly, this Court reviews de novo the proper interpretation of

court rules, legal doctrines, and contracts. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 229; 964 NW2d 809 (2020) (citations omitted).

## B. ANALYSIS

Karamo moved for summary disposition in the trial court and asserted that dismissal was appropriate under MCR 2.116(C)(4) because the trial court lacked subject-matter jurisdiction to decide the claims asserted in plaintiffs' complaint because they interfered with a political party's internal functioning. She also impliedly asserted that the circuit court's decision would violate her right to freely associate with the State Committee. The trial court rejected all these claims.

### 1. SUBJECT-MATTER JURISDICTION

Summary disposition is appropriate under MCR 2.116(C)(4) when a trial court lacks jurisdiction over the subject matter of the case. See *Macomb Co Prosecutor v Macomb Co Executive*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 370065); slip op at 3. A trial court should dismiss claims under MCR 2.116(C)(8) when, upon review of the pleadings, it appears that the claims are so clearly unenforceable that no factual development could justify recovery. *Id*.

"[S]ubject-matter jurisdiction concerns the right of a court to exercise judicial power over a certain class of cases, not a particular case within a class." *Usitalo v Landon*, 299 Mich App 222, 230; 829 NW2d 359 (2012) (citation omitted). Subject-matter jurisdiction is not contingent on the individual facts of the case. *Id*. Circuit courts are courts of general jurisdiction with the authority to decide all matters of law and equity unless otherwise prohibited by law. See *Greenfield Constr Co, Inc v Dep't of State Hwys*, 402 Mich 172, 194; 261 NW2d 718 (1978) (citations omitted). That power includes the authority to issue declaratory judgments. MCR 2.605(A)(1).

The trial court plainly had subject-matter jurisdiction to hear and decide plaintiffs' claims for declaratory judgment and the enforcement of the State Committee's bylaws to the extent that the bylaws applied to the parties. Indeed, the trial court correctly found that it was not rendering determinations addressing political policy. Therefore, the trial court did not err when it denied Karamo's motion for summary disposition under MCR 2.116(C)(4) for lack of subject-matter jurisdiction.

### 2. FREEDOM OF ASSOCIATION

In her reply brief, Karamo states that her claim of error addresses whether the trial court's interference in the internal management of the State Committee violated the State Committee's freedom of association protected under the First Amendment. In our view, Karamo conflated freedom of association and the political-question doctrine. Accordingly, we address both the freedom of association and the political-question doctrine in determining whether the trial court should have dismissed the case as one inappropriate for judicial review.

"Congress shall make no law . . . abridging the freedom of speech . . . ." US Const, Am I. "Although freedom of association is not explicitly enumerated in the First Amendment, the United States Supreme Court has found it to be a right included within the 'penumbra' of the First

Amendment." *McDonald v Grand Traverse Co Election Comm*, 255 Mich App 674, 681; 662 NW2d 804 (2003) (citation omitted). The freedom to associate includes as a corollary the right to refrain from associating with others. *Id*. The protections afforded by the First Amendment extend to the states through the Due Process Clause of the Fourteenth Amendment. *Id*. See US Const, Am XIV. The protections of the First Amendment against government interference also apply to a court's authority to enjoin conduct. See *Redmond v Heller*, 332 Mich App 415, 446-447; 957 NW2d 357 (2020).

"The essential right protected under the freedom of association doctrine is the right to join together in a group of like-minded individuals and exercise free speech rights." *Mich State AFL-CIO v Employment Relations Comm*, 453 Mich 362, 371; 551 NW2d 165 (1996) (opinion by BRICKLEY, C.J.). When state action "regulates the internal affairs of an organization, it violates the members' freedom of association if the compelled change in the internal affairs of the organization in turn affects the ability of the organization's members to come together and exercise free speech." *Id*. An order compelling disclosure of an association's membership violated the freedom of association when the social climate demonstrated there would be adverse consequences to the right to advocate beliefs and to the membership. *Id*. at 372. To that end, the state generally cannot regulate who may join or participate in a group's affairs contrary to the organization's own rules. *Id*. at 372-373; see also *id*. at 398 (opinion by MALLETT, J.) (agreeing that the freedom of association includes the right to decide who may join). And, the state may exceed its authority when the regulation tampers with the internal structure of an organization because such interference violates the individual members' freedom to associate with an organization structured in a particular way. See *id*. at 402-403 (MALLETT, J., concurring in part); see also *Boy Scouts of America v Dale*, 530 US 640, 648; 120 S Ct 2446; 147 L Ed 2d 554 (2000) ("Government actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association like a regulation that forces the group to accept members it does not desire.") (quotation marks and citation omitted).

The freedom of association is not absolute; the state may regulate associations when the state has a compelling interest that justifies the intrusion. See *McDonald*, 255 Mich App at 682. "Generally, state action that infringes on First Amendment rights will only be tolerated when such infringement is unavoidably required to further a compelling, paramount, or vital state interest." *Id*. The state does not have to meet the requirements of strict scrutiny, a less stringent standard applies to the regulation of an election law that exacts a lesser burden on an individual's right to freedom of association. *Id*. In such cases, courts weigh the character and magnitude of the burden imposed by the state against the interests that the state asserts justify the burden. *Id*. A regulation that imposes a severe burden on the right must be narrowly tailored and advance a compelling state interest. *Id*. Lesser burdens trigger less exacting review, and the state's important regulatory interests will normally justify reasonable, nondiscriminatory restrictions. *Id*. at 682-683.

The trial court's decision to allow plaintiffs to proceed with their claims did not violate Karamo's freedom of association or the freedom of association of the State Committee or any members of the State Committee. The State Committee adopted its own criteria for membership in its bylaws and established how persons become members, remain members, and are removed as members. The bylaws also established the manner by which its various members participate in the association; they identified the rights and duties for its members. The trial court's decision to allow plaintiffs' claims to proceed did not alter any of these internal structures; rather, the trial

court simply recognized that—absent application of some other doctrine governing justiciability—it had the authority to resolve a membership dispute consistent with the State Committee's bylaws. Any order or judgment entered by the trial court necessarily would not infringe on any one member's freedom of association because the order or judgment would merely enforce the right to associate with—or exclude—a particular person from the State Committee or from holding a particular position within the State Committee in the manner already established by the members of the State Committee through their bylaws. Similarly, the trial court's actual judgment did not alter the existing bylaws or prevent the State Committee from adopting new rules or modifying its existing rules. In sum, the trial court's orders and judgment did not affect the members' freedom to associate by tampering with the State Committee's rules governing who can be a member. See *Mich State AFL-CIO*, 453 Mich at 370-374 (opinion by BRICKLEY, C.J.). The orders and judgment did not even interfere with the State Committee's internal structure. *Id*. at 402-403 (MALLETT, J., concurring in part).

Even if the trial court's orders and judgment could be characterized as amounting to some level of interference in the freedom of association held by the State Committee's members, the enforcement of the State Committee's own bylaws in a court amounts to a *de minimis* burden on the members' freedom of association because of their establishment of the limitations through the bylaws. Moreover, because the State Committee has significant duties under election law that affected the state as a whole,[2] the state has an important regulatory interest in ensuring that the State Committee's members can enforce their rights and duties under the bylaws, which justifies the minimal government interference involved in allowing members to seek judicial enforcement of the bylaws. See *McDonald*, 255 Mich App at 683-688.

Karamo maintains that the decision in *Heitmanis v Austin*, 899 F2d 521 (CA 6, 1990), is binding on this Court and establishes that the trial court had to dismiss plaintiffs' claims on the ground that the trial court's assumption of jurisdiction would amount to interference with her freedom of association. It is well settled that, even when construing federal law, decisions by federal courts other than the Supreme Court of the United States are not binding on this Court, but they may have persuasive value. See *Abela v Gen Motors Corp*, 469 Mich 603, 606-607; 677 NW2d 325 (2004). In any event, Karamo's reliance on the decision in *Heitmanis* is misplaced.

In *Heitmanis*, 899 F2d at 522-523, the United States Court of Appeals for the Sixth Circuit addressed whether a group of Republican delegates could challenge the constitutionality of Michigan's election law, which made certain persons delegates to the party's state and county conventions contrary to the State Committee's then existing rules. The State Committee decided to retain that rule, notwithstanding the statute. The persons who would have been delegates, but for the State Committee's rule, sued in state court to protect their statutory rights. The state court sided with the plaintiffs in that case. *Id*. at 524. Other delegates from the party then sued in federal court and asserted that the state law, in relevant part, violated the State Committee's freedom of

---

[2] See, e.g., MCL 168.598 (addressing the state central political committee, county chairs and delegates); MCL 168.614a (state chairperson of each political party supplies potential candidate names).

association. The federal trial court dismissed the claims in part because it believed that the dispute was a nonjusticiable political dispute between factions within the party. *Id*. at 525.

The appellate court in *Heitmanis* first addressed whether the trial court correctly held that the constitutional challenge was nonjusticiable. It noted that the Supreme Court of the United States had expressed a general reluctance to intervene in the internal disputes of political parties. See *id*., citing *O'Brien v Brown*, 409 US 1, 4; 92 S Ct 2718; 34 L Ed 2d 1 (1972). Nevertheless, it recognized that—whether a claim was justiciable even though it involved a political party— depended on application of the test stated in *Baker v Carr*, 369 US 186; 82 S Ct 691; 7 L Ed 2d 663 (1962). See *Heitmanis*, 899 F2d at 525-526.

In *Baker*, 369 US at 209, the Supreme Court explained that the mere fact that a dispute involved political rights does not automatically render the dispute nonjusticiable. Rather, courts should determine whether a case was justiciable on a case-by-case basis:

> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing. [*Id*. at 217.]

The court in *Heitmanis* determined that this inquiry evolved into a two-part test:

> "The first criterion concerns policymaking: it requires the court to stay its hand when faced with 'the impossibility of deciding [the controversy] without an initial policy determination of a kind clearly for nonjudicial discretion.' . . . The second criterion concerns the practicability of a judicial resolution of the controversy; it forbids the court from entertaining the suit if 'judicially manageable standards for resolving' the controversy are absent." [*Heitmanis*, 899 F2d at 525-526, quoting *Wymbs v Republican State Executive Comm of Florida*, 719 F2d 1072, 1082 (CA 11, 1983).]

Applying the test to the case before it, the court in *Heitmanis* held that the lower court erred when it determined that the claims were not justiciable under the political-question doctrine. The court explained that the conflict was not one involving rules by the state party that conflicted with rules by the national party. Rather, there was a conflict between state law and the State Committee's rules. For that reason, it did not require the trial court to make a policy decision as between factions in a political party. Finally, because the statute was facially unconstitutional given that it interfered with the freedom of association, the court determined that the matter was ripe for adjudication, and it ultimately invalidated as unconstitutional the election law that required the State Committee to include members contrary to its rules. *Heitmanis*, 899 F2d at 526-527, 529-530.

Thus, the court in *Heitmanis* addressed whether the state statute unconstitutionally infringed on the State Committee's freedom to associate, which was protected under the First

Amendment, but it did not do so within the framework of a claim that the question was not justiciable. It also did not address whether the dispute—had it been one between the national committee's rules and the State Committee's rules—would have been justiciable. The court did not decide that issue because the case did not directly involve disputing factions within the party. Examined in context, *Heitmanis* stands for the proposition that whether a statute (or court action) unconstitutionally infringes on freedom of association is a separate inquiry from whether a particular matter is justiciable in the first place. Consequently, for the reasons already stated, to the extent that Karamo asserted that allowing the litigation to proceed to judgment would violate her freedom of association, the trial court did not err when it refused to dismiss the case on that basis.

## 3. JUSTICIABILITY

Michigan's courts are limited to deciding actual cases and controversies. *T & V Assoc, Inc v Dir of Health & Human Servs*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361727); slip op at 2. If a dispute is not justiciable, then it is not an actual case or controversy. See *Anway v Grand Rapids R Co*, 211 Mich 592, 609-610; 179 NW 350 (1920) (stating that a dispute for the judiciary arises when a determination is necessary for the decision of some immediate relief to be granted which the court may enforce by decree). For that reason, Michigan courts will carefully determine whether the claims before them fit within the judicial power:

> The "judicial power" has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making. [*Carter v DTN Mgt Co*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 165425); slip op at 6 (quotation marks and citation omitted).]

The political-question doctrine—and the other doctrines governing justiciability, such as mootness and ripeness—are rooted in the separation of powers inherent in divided government. See *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 196-197; 631 NW2d 733 (2001). Because state courts are not constrained by the same limitations applicable to federal courts under Article III of the Constitution of the United States, the state courts are free to develop their own rules governing justiciability. *ASARCO, Inc v Kadish*, 490 US 605, 617; 109 S Ct 2037; 104 L Ed 2d 696 (1989). Accordingly, and contrary to Karamo's contention on appeal, Michigan is not required to follow any particular federal test for determining justiciability under the political-question doctrine. Nevertheless, Michigan courts have looked to federal decisions for guidance on this doctrine.

Our Supreme Court adopted a prudential test for the political-question doctrine in Michigan that ultimately derived from the United States Supreme Court's decision in *Baker*. *House Speaker v Governor*, 443 Mich 560, 574; 506 NW2d 190 (1993), citing *Goldwater v Carter*, 444 US 996,

998; 100 S Ct 533; 62 L Ed 2d 428 (1979) (POWELL, J., concurring), citing *Baker*, 369 US at 217. Our Supreme Court clarified that the mere fact that a case involves political issues was not determinative of the need to defer to the political branches. *Id*. "Rather, as noted in *Baker*, '[t]he doctrine of which we treat is one of "political questions," not one of "political cases." ' " *House Speaker*, 443 Mich at 574, quoting *Baker*, 369 US at 217. The Court held that the political-question doctrine required analysis of three inquiries:

> (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations [for maintaining respect between the three branches] counsel against judicial intervention? [*House Speaker*, 443 Mich at 574 (quotation marks and citations omitted).]

Our Supreme Court has continued to apply that test when determining whether a case or controversy is not justiciable because it involves political questions. *Makowski v Governor*, 495 Mich 465, 472; 852 NW2d 61 (2014). The *Makowski* Court explained that the first inquiry looks to whether the Constitution or other law clearly delegates resolution of the dispute to a different branch. *Id*. at 472-476. As for the second inquiry, the Court stated that it must determine whether there are judicially discoverable and manageable standards for resolving the dispute or whether the dispute is impossible to resolve without an initial policy determination of the kind clearly for nonjudicial discretion. *Id*. at 477. Finally, courts must examine prudential considerations that might militate against intervention. *Id*. at 481. When a court does not address the merits of the decision at issue but instead looks to whether the power existed in the first instance, prudential considerations do not militate against intervention. *Id*. Nor does interpreting governing documents in a way contrary to the political branch's interpretation. The fact that a dispute is politically charged does not make it a political question. *Id*. at 481-482.

In this case, the trial court properly applied the test from *House Speaker* and determined that the dispute at issue was justiciable under the political-question doctrine. There is no law that commits intraparty disputes in a political association to a coordinate branch of government. Further, a court is not precluded from resolving purely legal disputes among the members of a political party. Accordingly, the first inquiry under *House Speaker* did not support application of the political question doctrine. See *id*. at 471-476.

The complaint and request for relief in this case also did not require the trial court to make a policy determination or resolve a policy dispute. The court at no point addressed whether any State Committee member's actions were prudent; the sole question was the legal effect of certain acts, as set forth in the State Committee's bylaws. Moreover, courts have extensive experience with the interpretation and application of written governing instruments. Indeed, courts traditionally resolve disputes between parties to an agreement by construing the agreement. See *Conlin v Upton*, 313 Mich App 243, 255; 881 NW2d 511 (2015) ("When validly promulgated, an entity's bylaws or similar governing instrument will constitute a binding contractual agreement between the entity and its members."). Therefore, this case did not present a situation in which there were no judicially discoverable and manageable standards for resolving the dispute. See *Makowski*, 495 Mich at 477.

As for the final inquiry, the prudential considerations did not favor nonintervention. Interpreting and applying the governing instrument does not show a lack of respect for the State Committee as a political entity. Rather, it demonstrates respect for that association's decision to promulgate rules that bind its members. Again, the trial court was not asked to assess the merits or prudence of the decision by some members to remove Karamo. The court was asked to determine whether the members properly followed the State Committee's bylaws such that they did in fact remove her. The court was then asked to enjoin Karamo from acting as though she had not been removed, if it determined that she *had* been removed. Consequently, there were no prudential considerations that favored nonintervention. See *id*. at 481-482.[3]

## 4. CONTRACTUAL LAW

Karamo also contends that the trial court erred to the extent that its decision relied on what she refers to as a contract exception to the application of the political-question doctrine. The trial court relied on the decision in *Conlin*, 313 Mich App 243, for the proposition that it had manageable judicial standards for interpreting and applying the State Committee's bylaws. It did not rely on that decision as an exception to the test stated in *House Speaker*.

In *Conlin*, 313 Mich App at 254-255, this Court stated the uncontroversial and longstanding rule that validly promulgated bylaws or other governing instruments of an entity amount to a binding contractual agreement between the entity and its members:

> Operating agreements, such as a corporation's bylaws, are intended to govern the future conduct of the entity and its members. *People ex rel Pulford v Detroit Fire Dep't*, 31 Mich 458, 465 (1875). Generally, an entity's bylaws or membership agreement may provide for the regulation and management of its affairs as long as the provision is not inconsistent with law or the articles authorizing the entity. See MCL 450.1231; MCL 450.4210. When validly promulgated, an entity's bylaws or similar governing instrument will constitute a binding contractual agreement between the entity and its members. See *Mayo v Great Lakes Greyhound Lines*, 333 Mich 205, 214; 52 NW2d 665 (1952) (providing that the members of a voluntary association are bound by the association's constitution and general laws); *Kauffman v Chicago Corp*, 187 Mich App 284, 287; 466 NW2d 726 (1991) (stating that the constitutions, rules, and bylaws of the entity at issue "constitute[d] a contract by all members" of the entity "with each other and with the [entity] itself"); *Allied Supermarkets, Inc v Grocer's Dairy Co*, 45 Mich App 310, 315; 206 NW2d 490 (1973) ("The bylaws of a corporation, so long as adopted in conformity with state law, constitute a binding contract between the corporation and its shareholders.").

---

[3] Karamo further relies on decisions by other circuit courts for the proposition that the claims at issue in this case are not justiciable. These decisions have no precedential value, and there is binding precedent directly on point. See MCR 7.215(J)(1); *Mich Open Carry, Inc v Dep't of State Police*, 330 Mich App 614, 624; 950 NW2d 484 (2019).

Thus, the trial court did not err when it cited *Conlin* for the proposition that there were judicially discoverable and manageable criteria for resolving the dispute brought before it. See *Makowski*, 495 Mich at 477.

Karamo further suggests that the bylaws for the State Committee are not true bylaws that are enforceable by a court of law because, in her view, the members did not engage in offer, acceptance, and consideration when joining the State Committee. More specifically, she asserts that bylaws are only enforceable when there is an "anchoring" document like a deed or employment contract underlying the bylaws. Karamo cites no authority for that novel proposition, and it contradicts longstanding caselaw governing the formation of enforceable agreements.

Our Supreme Court has explained that a valid and enforceable contract has five essential elements:

> "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *AFT Mich v Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015). "To have consideration there must be a bargained-for exchange"; "[t]here must be a benefit on one side, or a detriment suffered, or service done on the other." *Gen Motors Corp v Dep't of Treasury*, 466 Mich 231, 238-239; 644 NW2d 734 (2002) (quotation marks and citation omitted). Generally, courts do not inquire into the sufficiency of consideration: "[a] cent or a pepper corn, in legal estimation, would constitute a valuable consideration." *Id*. at 239 (quotation marks and citation omitted; alteration in original). [*Innovation Ventures, LLC v Liquid Mfg, LLC*, 499 Mich 491, 508; 885 NW2d 861 (2016).]

There was no dispute in the trial court that the State Committee validly promulgated its bylaws before the events at issue, and there was no dispute that the bylaws governed the State Committee and the relationships between the members and the entity. As an unincorporated association, the State Committee's members collectively owned and managed the State Committee's assets, which would include its real property, personal property, intellectual property, and its contractual rights and obligations. See *People v Budzan*, 295 Mich 547, 550-551; 295 NW 259 (1940) ("In an unincorporated association, however, title to purchases vests in the members and, consequently, if the members in the instance at bar drank only what belonged to them this did not constitute a sale or gift to them by any one."); *Detroit Society for the Study and Prevention of Tuberculosis v Detroit Society for Study and Prevention of Tuberculosis*, 167 Mich 102, 105-107; 132 NW 547 (1911) (stating a successor incorporated entity was not entitled to funds raised by the predecessor unincorporated entity because the new entity was not created by the unanimous consent of the members). Members who leave the association—whether voluntarily or involuntarily—would not, moreover, be entitled to any portion of the property so long as any members remain in the association. See *Walters v Pittsburg & Lake Angeline Iron Co*, 201 Mich 379, 386-387; 167 NW 834 (1918). For these reasons, obtaining and retaining membership in the State Committee has clear value in the form of property rights even if service in the State Committee is otherwise uncompensated, and service by individual members has clear value to the State Committee.

When an individual member joins the State Committee, that member accepts an offer to join all the other members with an implied promise that the member will have the rights and obligations identified in the entity's governing instruments, which in this case was the State Committee's bylaws. The offer to a new member to join the State Committee accompanied with the new member's acceptance of that offer, therefore, satisfies all the elements of a binding contract between that member and the existing members and the entity because the existing members get the benefit of the new member's service, and the new member gains the right to control and direct the use of the State Committee's assets as provided in the bylaws.[4] Accordingly, the bylaws are a binding contractual agreement that gives individual members rights and obligates them to certain duties, which can be enforced by a court sitting at law or in equity. See *Innovation Ventures*, 499 Mich at 508.

According to the allegations stated in plaintiffs' complaint, the case was justiciable. Consequently, the trial court did not err when it refused to dismiss the case under MCR 2.116(C)(8) on the ground that the political-question doctrine precluded justiciability.

## III. STANDING AND QUO WARRANTO

### A. PRESERVATION

Karamo next argues that plaintiffs did not have standing to bring their claims. She also maintains that the law applicable to an action for quo warranto governed the claims at issue and that plaintiffs did not meet the standing requirements for an action for quo warranto.

In civil cases, Michigan follows "the 'raise or waive' rule of appellate review." *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). Under that rule, to preserve an issue for appellate review, the party asserting error must demonstrate that the issue was raised in the trial court. *Glasker-Davis*, 333 Mich App at 227. Moreover, the party asserting error must show that the same basis for the error claimed on appeal was brought to the trial court's attention. *Samuel D Begola Servs, Inc v Wild Bros*, 210 Mich App 636, 642; 534 NW2d 217 (1995). The failure to raise an issue in the trial court waives that issue for appellate review. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 3.

In the trial court, Karamo asserted that plaintiffs lacked standing in the context of her argument that the real cause of action at issue was a claim for quo warranto. Therefore, she properly raised a challenge that the trial court should have applied the law applicable to an action for quo warranto, which included the standing requirements of that law. *Glasker-Davis*, 333 Mich App at 227. She did not, however, challenge plaintiffs' standing in any other way.[5] Because she

---

[4] Notably, the bylaws also require its members to financially contribute to the State Committee, which constitutes additional consideration for the membership.

[5] Karamo claims on appeal that she preserved her claim involving general principles of standing by raising it in her amended motion for summary disposition. In her amended motion, Karamo

-14-

did not assert the same basis on appeal, she did not preserve a claim of error premised on standing other than the standing to bring a quo warranto claim. *Samuel D Begola Servs*, 210 Mich App at 642. Because this claim of error is not preserved, Karamo waived it. See *Tolas Oil & Gas Exploration*, ___ Mich App at ___; slip op at 3. Additionally, Karamo's entire standing claim— excepting a block quote from a bench book—consists of a single paragraph in which she claims that Ambassador Hoekstra was the real party in interest, that he was not joined as a necessary and indispensable party, and that plaintiffs did not have any unique rights to assert. Karamo's failure to offer any meaningful analysis of the law of standing and how it applies to the facts of this case amounts to a waiver of her general standing claim of error. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Under these facts, we decline to exercise our discretion to review this abandoned claim of error. See *Tolas Oil & Gas Exploration*, ___ Mich App at ___; slip op at 3.

## B. STANDARD OF REVIEW

This Court reviews de novo whether the trial court properly selected, interpreted, and applied the relevant statutes and court rules. *Brecht v Hendry*, 297 Mich App 732, 736; 825 NW2d 110 (2012). This Court also reviews de novo whether a party has standing to bring a claim. *MCNA Ins Co v Dep't of Technology, Mgt & Budget*, 326 Mich App 740, 743; 929 NW2d 817 (2019).

## C. ANALYSIS

On appeal and in the trial court, Karamo argued that plaintiffs' claims were really an attempt to establish who was the rightful chair of the State Committee, which was a challenge to her right to hold office. For that reason, she maintained that the trial court had to apply the law of quo warranto.

It is well settled that courts are not governed by the labels that parties apply to their claims and that courts will apply the correct law after determining the gravamen of a claim. *In re Bradley Estate*, 494 Mich 367, 387 n 49; 835 NW2d 545 (2013). "Quo warranto is a common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed." *Boike v Green*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365681); slip op at 3 (quotation marks and citation omitted). The Legislature has provided that generally the attorney general is responsible for bringing an action for quo warranto if the facts clearly warrant the filing, but a private person may bring the action upon leave of the court if the attorney general refuses to act. MCL 600.4501(1). The Legislature recognized that an action for quo warranto normally applies to determine who holds title to public office, a public franchise, or a public privilege. See MCL 600.4505; MCL 600.4511; MCL 600.4515. Nevertheless, the Legislature also provided that an action in quo warranto may lie to adjudicate whether a private corporation has forfeited its corporate rights or other privileges or franchises granted by a public authority. See *Attorney General v Diamond Mortgage Co*, 414 Mich 603, 621-622; 327 NW2d 805 (1982); *People ex rel O'Brien v Society of Good Neighbors*, 327 Mich 620, 625-626; 42 NW2d 761 (1950); see also MCL 600.4521; MCL 600.4525; MCL 600.4531; MCL 600.4535.

---

asserted that plaintiffs' claims really sounded as an action for quo warranto and plaintiffs did not have standing to assert quo warranto. She did not discuss any other challenge to standing.

-15-

In this case, Karamo was not the holder of a public office within the meaning of MCR 3.306(A)(1) and MCR 3.306(B)(1)(a). She also did not hold office in a "public corporation created by this state's authority" within the meaning of MCR 3.306(B)(1)(b) because the State Committee was not a public corporation. See *Gallaher v Keefe*, 232 Mich App 363, 367; 591 NW2d 297 (1998) (recognizing that the definition applies even in its broadest sense only to corporations that were created to perform a governmental or quasi-governmental function); *Dartland ex rel De Motts v Hancock Schs*, 25 Mich App 14, 19; 181 NW2d 41 (1970) (stating that a public corporation is a corporation created by government to administer a portion of governmental power delegated to it). For that reason, the provisions of quo warranto that apply to office holders did not apply to this case.

This case also did not involve an action to prevent the State Committee from acting as though it were a corporation without being legally incorporated, see MCR 3.306(B)(1)(c), and did not involve a situation in which the State Committee might have forfeited a franchise through nonuse, violation of law, or other misconduct, see MCR 3.306(B)(1)(d) through (g).[6] In the absence of allegations suggesting that a private association acted as though it had a franchise when it did not, or that a private corporation has acted in such a way as to forfeit its franchise, a claim does not involve quo warranto. Although quo warranto can be used to challenge the title of a director in a private corporation, quo warranto only applies in such circumstances if there is a law governing how the corporation must elect its directors. See *Attorney General ex rel Dusenbury v Looker*, 111 Mich 498; 69 NW 929 (1897). Quo warranto is not a general cause of action to be used to resolve contractual disputes between members of a private entity about the proper seating of management. The dispute at hand was an internal dispute in a private association, which was governed by contract law, not quo warranto. See MCR 3.306(B)(1).

The trial court did not misapply the law when it refused to apply the law of standing applicable to an action for quo warranto because the claims at issue did not involve a public office, did not involve an unincorporated entity acting as though it were incorporated, and did not involve a challenge to a private corporation's exercise of its franchise. See *Brecht*, 297 Mich App at 736. Consequently, the trial court did not err when it refused to dismiss plaintiffs' claims on that basis.

## IV. PERMANENT INJUNCTION

### A. STANDARD OF REVIEW

Karamo next argues that the trial court lacked the authority to enter a permanent injunction on a motion for summary disposition because plaintiffs did not include a request for a permanent

---

[6] As already noted, the State Committee has not been incorporated under this state's law. Citing 26 USC 527(e)(1), Karamo maintains that the State Committee was formed under federal law. That statute provides a tax exemption for political organizations even when the organizations are unincorporated. See 26 USC 527(a) (limiting the tax imposed on political organizations to the tax imposed by that section); 26 USC 527(e)(1) (stating that a political organization includes, in relevant part, committees even if unincorporated). It does not amount to an enabling statute for the formation of corporate entities.

injunction in their complaint's prayer for relief. This Court reviews de novo a trial court's decision to grant summary disposition. *Bakeman*, 344 Mich App at 73.

## B. ANALYSIS

On appeal, Karamo does not identify any law that precludes a trial court from granting injunctive relief on a motion for summary disposition if the moving party did not request that relief in its complaint. She cites the court rule that authorizes a moving party to move for summary disposition on a claim and notes another court rule that requires a complaining party to include a request for relief in their complaint. Michigan requires notice pleading, which means that a complaint is sufficient when it reasonably informs the opposing party about the nature of the plaintiff's claim. *Veritas Automotive & Machinery, LLC v FCA Int'l Operations, LLC*, 335 Mich App 602, 615; 968 NW2d 1 (2021). As our Supreme Court has stated, notice pleading ended prior strict requirements:

> In short, the pleader today is to have some elbow room. He is no longer confined to the straight-jacket of the ancient writ. Pleading is not an end in itself. To the degree that it is so regarded we make adjective law an agency for defeating or delaying substantive law and justice instead of one for enforcing and speeding them. [*Jean v Hall*, 364 Mich 434, 438; 111 NW2d 111 (1961) (quotation marks and citation omitted).]

Karamo was clearly on notice from the inception of this case that plaintiffs sought both declaratory relief and an injunction against further breaches of contract. Plaintiffs titled their complaint, "Verified Complaint for Declaratory and Injunctive Relief," which suggests that they intended to request injunctive relief even if they did not specifically pray for it. Plaintiffs even moved for entry of a preliminary injunction at the start of the case and prevailed upon the court to enter it after a three-day hearing. They also asked the trial court to make numerous declarations about the legal effect of certain actions in their complaint, which included a declaration that all actions "that Ms. Karamo has taken after being removed on January 6, 2024, including but not limited to, any meeting she has called and held, are void and have no force or effect." These requests for declaratory relief put Karamo on notice that the trial court had the authority to enjoin further breaches of the bylaws through an injunction at some future point. See MCR 2.605(F) ("Further necessary or proper relief based on a declaratory judgment may be granted, after reasonable notice and a hearing, against a party whose rights have been determined by the declaratory judgment."). Finally, our Supreme Court recognized that a court sitting in equity had the authority to grant additional relief not specifically requested in the complaint even though the more general practice was to limit the relief to "that supported by specific allegation and prayer of the bill . . . ." *McLean v Wortman*, 353 Mich 458, 469; 91 NW2d 811 (1958). Consequently, Karamo has not shown that the trial court lacked the authority to enter an injunction simply because plaintiffs did not pray for an injunction in their complaint.

## V. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Finally, Karamo challenges the trial court's decision to grant plaintiffs' motion for summary disposition under MCR 2.116(C)(10) on a variety of grounds. This Court reviews de novo a trial court's decision to grant summary disposition. *Bakeman*, 344 Mich App at 73. This Court also reviews de novo the proper interpretation and application of agreements, such as bylaws. See *Conlin*, 313 Mich App at 254.

### B. ANALYSIS

For the reasons already explained, and contrary to Karamo's contention on appeal, the State Committee's bylaws constituted a valid and binding contractual agreement between each of the members. See *Innovation Ventures*, 499 Mich at 508; *Conlin*, 313 Mich App at 254-255. Accordingly, to determine the effect of certain undisputed actions by the parties, which were taken in their official capacities as members of the State Committee, it was necessary to construe the bylaws and determine how the bylaws applied to those actions. The trial court construed the bylaws and determined that—as a matter of law—certain members of the State Committee properly called a special meeting for January 6, 2024, and effectively removed Karamo as chair at that meeting.[7] On appeal, Karamo argues that the trial court erred in its interpretation and application of the bylaws.

The primary goal of contractual interpretation is to honor the intent of the parties. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 473; 663 NW2d 447 (2003). To ascertain the contract's meaning, the appellate court will construe the agreement's terms by giving those terms "their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005). A contract must be read as a whole to determine and give effect to the parties' intent. See *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 292; 778 NW2d 275 (2009). A court cannot ignore a portion of the agreement in order to avoid or find an ambiguity; rather, the court must give effect to every word or phrase as far as practical. *Klapp*, 468 Mich at 467. Courts must avoid an interpretation that would render any part of the contract surplusage or nugatory. *Id*. at 468. If a contract is unambiguous, it is the duty of the court to interpret it. If it is ambiguous, the contract's meaning is for the jury to decide. *Id*. at 469. A contract is ambiguous when it is equally susceptible to different interpretations or when two provisions irreconcilably conflict with each other. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007).

---

[7] On appeal, Karamo maintains that there must have been a question of fact because the trial court relied on an expert on Robert's Rules of Order during the hearing to consider whether to grant a preliminary injunction. The duty to interpret and apply the law—which was the governing bylaws in this case—is the function of the court, not the parties' expert witnesses. *Hottmann v Hottmann*, 226 Mich App 171, 179; 572 NW2d 259 (1997). Accordingly, the mere fact that an expert testified did not establish that the proper interpretation and application of the bylaws constituted a disputed question of fact.

# 1. CALLING THE SPECIAL MEETING

Karamo claims that the trial court misinterpreted the bylaws, or took from the jury the question of how to interpret the bylaws, when it determined that the members who requested the special meeting to remove Karamo validly requested and called the special meeting.

The State Committee's bylaws address special meetings under Article VI, § B, which provides:

> Special meetings of the Committee may be called by the Chairman when the business of the Committee requires the same, and the Chairman shall call a special meeting of the Committee on written request of one-third of the members of the Committee, jointly or severally, within 15 days after such written request has been filed with the Chairman. Upon failure to do so, any such member can give notice five (5) days before such meeting. Notices of special meetings shall state the purpose of such meetings.

Notably, this section provides guidance to the State Committee of: (1) the manner for calling a special meeting, and (2) the notice for a special meeting must state the purpose of the meeting.

The State Committee's bylaws do not define what constitutes a special meeting. The bylaws do, however, provide that Robert's Rules of Order, Newly Revised, "govern the conduct of all meetings of the Committee and its standing committees, except as provided in these Bylaws or by law." Article VII, § D. Accordingly, the State Committee's members agreed that Robert's Rules of Order, Newly Revised, would govern the manner for calling, noticing, and holding meetings of the State Committee, except as otherwise provided in the bylaws. Under Robert's Rules of Order, a special meeting is a meeting that has been called between regular meetings. See Robert's Rules of Order, Newly Revised (12th ed), § 9:13, p 83. Robert's Rules of Order further provide that an assembly meeting at a special meeting may only "consider one or more items of business specified in the call of the meeting," and the notice for the call must state the purpose of the meeting. Robert's Rules of Order, Newly Revised (12th ed), § 9:13, p 83; see also § 9:15, p 84 (limiting the business that may be transacted at a special meeting to the business specified in the call).

There was no dispute in the trial court that, on December 2, 2023, more than one-third of the State Committee's members requested that Karamo call a special meeting. The requesting members asked Karamo to call a special meeting to include the following agenda items: "Transparency, Accountability, Unity, Proposed Bylaw Amendment, review and possible removal of Kristina Karamo, Dan Hartman, Robert Owens and Jim Copas." The members who made the request, however, did more than just ask for a special meeting on the agenda items; the requestors also identified the date that they wished the meeting to occur—December 27, 2023—and identified the persons that they wished to run the special meeting. The bylaws did not, however, give members the authority to dictate the date of the special meeting or the right to alter the presiding officers for the special meeting. Instead, Article VI, § B of the bylaws provided only that, upon receiving a qualifying request, the chairperson "shall call a special meeting of the Committee." Notwithstanding these additional terms, the members' request was supported by the requisite

number of signatures and made it clear that the requesting members wanted a special meeting to consider, in relevant part, whether to remove Karamo as chairperson.

Nothing within Article VI, § B of the bylaws invalidated a request that delineated additional terms—such as the identification of a specific meeting date—that were beyond the scope of those permitted by the bylaws. Courts cannot rewrite the unambiguous provisions of Article VI, § B of the bylaws to include a penalty provision for requests that exceed the minimum content necessary to invoke the chairperson's duty to call a special meeting. See *Cottrill v Mich Hosp Serv*, 359 Mich 472, 476; 102 NW2d 179 (1960). Because the members called for a special meeting by the chair in writing and gave notice of its purpose, the trial court did not err when it determined that the members who signed the request of December 2, 2023, complied with the minimum requirements and properly invoked Karamo's duty to call a special meeting.

On appeal, Karamo contends that the trial court erred when it determined that the members who requested the meeting on December 2, 2023, had the right to call their own meeting for January 6, 2024. Karamo asserts that the trial court erred in that determination because there was a dispute about whether she complied with her duty to call a meeting when she had the State Committee's secretary notice a special meeting for January 13, 2024.

Article VI, § B of the State Committee's bylaws required Karamo to call a special meeting "on written request of one-third of the members of the Committee, jointly and severally, within 15 days after such written request has been filed." The bylaws further provided what would happen if Karamo failed to call the requested meeting: "Upon failure to do so, any such member can give notice five (5) days before such meeting." The chairperson's failure to make a call when properly requested under Article VI, § B of the bylaws authorizes one of the members who signed the request to notice the special meeting.

Karamo maintains that the bylaws governing special meetings do not require the chairperson to call a special meeting upon the written request of members for any particular purpose. Rather, she contends that a chairperson can comply with his or her duty to schedule a special meeting by calling a special meeting for any purpose, even one that does not include any of the agenda items identified by the members in their request.

As noted, Robert's Rules of Order states that an assembly can only consider the items for which the meeting was called at a special meeting. Robert's Rules of Order, Newly Revised (12th ed), § 9:13 and § 9:15, pp 83-84. Additionally, the bylaws state that, for all special meetings called under Article VI, § B, the notices must "state the purpose of such meetings." Because the notice must include the purpose for the special meeting under the bylaws, and the special meeting is limited to considering the business identified in the purpose, the chairperson cannot call a special meeting without including the purpose of the meeting. As a corollary, when one-third of the members make a written request for a special meeting, they too must identify the purpose of the meeting.

It necessarily follows from these provisions that the chairperson must call a special meeting consistent with the members' stated purpose within 15 days of the request, or the members may notice the meeting themselves. Calling a special meeting without including the purpose identified by the requesting members effectively eliminates the power of members to request special

meetings because a chairperson could invariably frustrate the members' request by calling a special meeting for a different purpose. Karamo's preferred interpretation of the special meeting provisions would render nugatory the committee members' right to request a special meeting and would negate their power to notice such a meeting on their own if the chairperson failed to comply with her duty to call the special meeting. Courts will avoid a construction that renders any part of the contract nugatory. *Patel v FisherBroyles, LLP*, 344 Mich App 264, 272; 1 NW3d 308 (2022). Karamo's interpretation is inconsistent with the plain language of the bylaws.

Karamo also alleges that she had no duty to include as an agenda item the question whether she should be removed as chairperson because the members who requested a special meeting listed that agenda item without first filing the petition required under the bylaws. Karamo relies on Article IV, § G(2) of the bylaws, addressing removal of officers by committee:

> Any officer may be removed as an officer and member of this Committee by the Committee upon a seventy-five percent (75%) vote of the Committee present and voting at any meeting of the Committee, provided there is a quorum present, and such seventy-five percent (75%) vote must be made in person by such members and not by proxy; provided, further, that in order to bring the question before the Committee as to the removal of an officer, a petition requesting that such a vote be taken, bearing the signatures of at least fifty percent (50%) of the entire Committee (no proxies allowed), shall be filed with the Chairman (or, if the Chairman is the officer in question, then such petition shall be filed with the Secretary).

The plain language of this provision does not include a limitation on the ability to call a meeting premised on the timing of the filing of the petitions with the chair or secretary or that the petition receipt is necessary to even call for the meeting. *Rory*, 473 Mich at 464.

Karamo further maintains that what constitutes bringing a matter before the State Committee constitutes a question of fact for the finder of fact. Karamo's interpretation does not comport with the language of Article IV, § G(2) of the bylaws, and the proper application shows that the manner for bringing a matter before the State Committee is a question of law.

The bylaws do not specify who must file the petition; they provide only that someone must do so. As for the timing, the bylaws state that the petition must be filed as a prerequisite to bringing "the question before the Committee." More specifically, the petitioners must request that "such a vote be taken." Under Robert's Rules of Order, the only way to bring business before an assembly is by the motion of a member: "Business is brought before an assembly by the *motion* of a member. A motion may itself bring its subject to the assembly's attention, or the motion may follow upon the presentation of a report or other communication." Robert's Rules of Order, Newly Revised (12th ed), § 3:21, p 24.[8] The rules further state that the "basic form of motion—the only one whose

---

[8] On appeal, Karamo relies on Robert's Rules of Order, Revised (4th ed) for the proposition that business is brought before an assembly either by motion or by the presentation of a communication to the assembly. See Robert's Rules of Order, Newly Revised (12th ed), Editions Summary (noting that Robert's Rules of Order, Revised (4th ed) was superseded in 1943 by the fifth edition).

introduction brings business before the assembly—is a *main motion*." Motions other than a main motion do not bring business before the assembly. Robert's Rules of Order, Newly Revised (12th ed), § 3:23, p 24. That understanding is consistent with the fact that the bylaws require that the petition state that the petitioners are requesting a "vote" on the removal of an officer.

Because the bylaws state that a vote to remove an officer may be made at any meeting—whether special or regular—and a regular meeting is not limited to items that appear on the agenda, it follows that the provision for a petition is a limitation on the business that may be brought before an assembly by motion—not a limitation on the ability to call a meeting in the first instance. Consequently, the members who requested the special meeting could request a special meeting that included the removal of an officer as an agenda item even though no one had filed the petition required by Article IV, § G(2) of the bylaws before the request. The petition had only to be filed before someone could bring the matter up for debate at a meeting in progress by a main motion.[9] And that is precisely what happened in this case; the members who met on January 6, 2024, filed a qualifying petition immediately before the meeting commenced. The trial court did not err when it determined that a qualifying petition was filed before the vote, which was the only requirement stated under Article VI, § G(2) of the bylaws.

Karamo also asserts that the petition was invalid because it had to be signed by 50% of the "entire Committee" under Article IV, § G(2). She maintains that the "entire committee" is far more than the 107 regular members—it includes ex officio members, nonvoting members, and paid members. Article III, § A of the bylaws makes it clear that the regular members of the committee are the persons empowered to run the State Committee. In any event, the parties did not dispute in the trial court that the total number of members in the State Committee was 107 members for all purposes before the trial court. Accordingly, by failing to raise and develop this issue in the trial court, Karamo waived it for appellate review, and we decline to consider it further. See *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___; slip op at 3. The trial court did not err when it used that number for calculating the number of signatures needed to put a vote to remove the chairperson before the State Committee during the meeting held on January 6, 2024.

---

She then argues that this provision establishes that a communication, such as the request for a special meeting, is something that brings a matter before an assembly. The expired Robert's Rules of Order are not binding under Article XIV of the bylaws. Additionally, her interpretation of the older rules is incorrect. The expired version states that a matter is brought by motion—at a meeting already properly begun—or by the "presentation of a communication to the assembly." The context shows that the presentation of the communication must be made to the assembly as assembled at a meeting. That is, in both cases the assembly must actually be in session before a matter can be brought before it. Merely calling for a meeting at which a matter might be brought does not in fact bring the matter before the assembly.

[9] Karamo suggests on appeal that she had the unilateral right to interpret the bylaws and that her interpretation could not be challenged except in a specified manner under the bylaws. Karamo does not cite the State Committee's bylaws or Michigan law. She does cite Robert's Rules of Order, but her citation does not correspond to any known version. Karamo's cursory treatment of this claim amounts to abandonment on appeal. See *Mitcham*, 355 Mich at 203.

Karamo next contends that only the State Committee's secretary could notice a meeting under Article V, § I of the bylaws. That section states that the secretary has the duty to "give notice to the membership of all meetings by sending same to the post office address of the member recorded with the Committee." Although the bylaws specify that it is the secretary's *duty* to provide the notices, nothing in the bylaws provides that no other person or staffer can provide notice. In any event, Article VI, § B specifically states that a member who was one of the members who requested a special meeting that was not properly called by the chairperson "can give notice" of the special meeting. Therefore, there was nothing improper about the fact that a member sent the notice for the special meeting rather than the secretary.

Karamo also stated that that the original request for a special meeting included the date for the special meeting, which was listed as December 27, 2023. She suggests that, because the request included that date, the subsequent notice of the date for the special meeting as January 6, 2024, was invalid. She maintains that, after the canceling the first date, the members who made the initial request for a special meeting had to begin the process anew. Karamo's contention is unsupported by the bylaws.

The members who requested the special meeting on December 2, 2023, included numerous items in their request that were beyond the scope of a request for a special meeting under Article VI, § B. There were no provisions in the bylaws that allowed the requesting members to use the request to compel the chairperson to select a particular date or to limit the time within which the chairperson could call the special meeting. Therefore, the request for a special meeting on that date did not amount to a call and notice under the bylaws that a meeting would in fact take place on December 27, 2023. There was, for the same reason, no need to cancel that meeting date. Moreover, the right to call and notice the meeting did not vest in the requesting members until Karamo failed to call the meeting made by the requesting members within 15 days. Thereafter, the requesting members had the right to notice the special meeting that they had requested of the chairperson. The bylaws also did not provide any limitation on the timing of the notice by the members who made the initial request except that the notice had to be made at least five days before the date of the special meeting. Consequently, the trial court did not err when it refused to read Karamo's preferred limitations on the authority of the requesting members to call a special meeting into the bylaws. See *Cottrill*, 359 Mich at 476.

Karamo additionally suggests—without much discussion—that any notice was defective because the notice was not mailed to the members. Karamo relies on the duties prescribed to the secretary under Article V, § I of the bylaws, which states that the secretary has a duty to provide notice of all meetings by sending the notice to the post office address of the member recorded with the State Committee. This provision appears to conflict with Article VI, § G, which allows notice to be made by any reasonable means:

> For purposes of these Bylaws, the term "mail" shall be defined as mail by the U.S. Postal Service, electronic mail, facsimile transmission, private mail delivery service, or personal delivery. Any notices or notification pursuant to these Bylaws may be sent by any reasonable means, including, but not limited to, by the U.S. Postal Service, electronic mail, facsimile transmission, private mail delivery service, telephone or personal delivery.

-23-

The fact that the drafters twice repeated that notice for meetings could be sent by e-mail demonstrates that the drafters intended Article VI, § G to govern all notices for meetings notwithstanding the provisions of Article V, § I. In any event, Article V, § I establishes the duties for the secretary; it does not establish the rule for providing notice for meetings by someone other than the secretary. Karamo failed to establish that the notice actually provided by the members who requested the special meeting was improper.

The undisputed evidence showed that Karamo called a special meeting for January 13, 2024, and that she did so within the 15-day limit. She did not, however, provide notice that the special meeting to be held on January 13, 2024, would include consideration of the agenda items that the members who sought a special meeting identified in their request of December 2, 2023. Because Karamo called for a special meeting that did not include those agenda items, her call for a special meeting did not meet the requirements of Article VI, § B of the bylaws. After the expiration of the 15-day period, "any such member" from the members who made the request for a special meeting could give notice of the requested special meeting as provided in Article VI, § B of the bylaws. The trial court did not err when it determined that, under the undisputed facts, the requesting members had the authority to call their own special meeting because Karamo failed to call the special meeting that they requested within the time limit. The trial court also did not err when it determined that the members who called the special meeting for January 6, 2024, did so properly given the undisputed facts.

## 2. CONDUCTING THE SPECIAL MEETING

Karamo also argues that the trial court erred in several respects when it determined that the members present at the special meeting held on January 6, 2024, validly removed her as chairperson of the State Committee.

First, she claims that the bylaws allow only the secretary or the secretary's designee to perform the functions of a secretary at a meeting. Because the secretary did not show for the meeting on January 6, 2024, and did not appoint a designee for that meeting, Karamo argues that the meeting held on that date was invalid.

Karamo's contention relies exclusively on the fact that Article V, § I of the bylaws provide that the secretary or the secretary's designee has the duty to "keep an accurate record of the minutes of each meeting." Karamo would have this Court read the duties assigned to the secretary as exclusive rights, which only the secretary could perform. That interpretation would—in effect—give the secretary unbridled power to prevent all action by the State Committee by simply refusing to attend meetings and refusing to designate a designee for the meetings that she did not attend. Karamo's interpretation requires this Court to read into the bylaws an exclusive right that is unsupported by the plain language of the bylaws; this Court cannot read such an expansive power into the bylaws. See *Cottrill*, 359 Mich at 476. Rather, because the bylaws are silent as to those cases in which the secretary is incapacitated or otherwise fails to comply with their duties under Article V, § I, Robert's Rules of Order provide the default provisions for handling meetings under those circumstances under Article XIV of the bylaws.

Consistent with Article V, § I of the bylaws, Robert's Rules of Order generally provides that a secretary has the duty to take the minutes at a meeting and perform other ministerial

functions, such as furnishing credentials. See Robert's Rules of Order, Newly Revised (12th ed), § 47:33, pp 437-438. Robert's Rules of Order, however, contemplates that the secretary may be unwilling or unable to perform their duties at a meeting. In such cases, the rules provide that, in the "absence of the secretary, a secretary pro tem must be elected." See Robert's Rules of Order, Newly Revised (12th ed), § 47:33, p 438. Therefore, the trial court did not err when it determined that the secretary's decision not to attend the meeting held on January 6, 2024, or to designate a secretary pro tem for that meeting, did not invalidate that meeting. Instead, the members who attended the meeting had the right and obligation to elect a secretary pro tem who could lawfully perform the secretary's functions at that meeting. Under the circumstances, they properly elected DeLisle to be the secretary pro tem for the meeting.

Karamo also maintains that it was tradition to require members to submit proxies before a meeting, which would then be vetted by the secretary. Karamo presented no evidence that prior practice had the force of law for the State Committee. She also relies on Article VI, § F, which governs meetings held by "conference telephone or similar communications equipment." The bylaws provide that a member may not vote at such a meeting by proxy unless the proxy is sent to the chairperson before the meeting. It was, however, undisputed that the meeting held on January 6, 2024, was not done by telecommunications equipment; instead, the meeting was held in person. Therefore, there was no requirement that proxies be sent before the meeting at issue. Indeed, the express provision for such a limitation in this section implies that the omission of such a provision in the other sections was deliberate. *Mich Ambulatory Surgical Ctr v Farm Bureau Gen Ins Co of Mich*, 334 Mich App 622, 632; 965 NW2d 650 (2020).

There was also no evidence that the members who appeared in person at the meeting on January 6, 2024, mishandled the proxies. Article VI, § C, allows members to establish a quorum through members actually present or present by proxy. Similarly, under Article VI, § D, a member may vote in person or by proxy "at any meeting." The bylaws state under Article III, § J, that, for a member other than a congressional district member who does not appear and who does not provide a proxy, "that position shall not be filled by any other person." As for congressional district members, however, the State Committee's bylaws contemplate that replacements can be selected after it becomes clear that there is a vacancy for the meeting. Specifically, Article III, § I of the bylaws provides that, when a member of the State Committee who is from a particular district does not show up for a meeting and does not send a proxy to appear on their behalf, that member's district chairperson—in relevant part—may select a registered voter from their congressional district to fill the vacancy for the meeting. There is no way for a chairperson to know whether a vacancy will occur with certainty until the actual meeting; it follows that the bylaws contemplate that a district chairperson can appoint replacements for missing members on the day of the meeting.

In this case, several members sent a proxy to appear on their behalf at the meeting held on January 6, 2024. Additionally, the district chairpersons who attended the meeting appointed replacements for the members from their congressional districts who did not attend, as they were permitted to do under Article III, § I. Because the bylaws specifically contemplated that a district chair can appoint replacements for members who do not attend a particular meeting on the day of the meeting, and do not otherwise require proxies to be submitted before a meeting except in cases of meetings held by telecommunications, the trial court did not err when it determined that the 26 persons who appeared as proxies for other members were validly appointed proxies.

On appeal, Karamo maintains that the proxies cannot be treated as proxies for any business on which they could not vote. She then takes that proposition and argues that a person appearing under the authority of a proxy cannot be counted for establishing a quorum on any business for which the proxy could not vote. Karamo relies on Article VI, § D, Article IV, § G, and Article VI, § C of the State Committee's bylaws. When properly interpreted, none of those sections supports Karamo's contention.

Under Article VI, § D, the bylaws state that persons "authorized to vote may vote in person or by proxy at any meeting of the Committee, provided that such person shall be allowed to cast only one vote on each item of business transacted." This section does not state that a person who does not have a right to vote on a particular item of business cannot be counted for purposes of establishing a quorum to conduct business at the meeting. It only provides that, for those items of business on which a person is authorized to vote in person or by proxy, that person will be entitled to only one vote per item of business.

As already discussed, Article IV, § G(2), describes the manner for removing an officer. It states that an officer may only be removed by the vote of 75% of the members of the State Committee "present and voting at any meeting." It further provides that there must be a quorum present at the meeting and the 75% vote "must be made in person by such members and not by proxy." Nothing within this section prescribes that the members appearing by proxy cannot be counted for purposes of determining a quorum for conducting business at the meeting. To the contrary, the section plainly contemplates that a bare quorum is sufficient to allow a vote, but limits the persons who may participate in the actual vote to those members who appeared in person. It further requires that 75% of those persons support the vote.

Finally, Karamo places great weight on the language of the quorum provision in the bylaws for the proposition that whether a meeting has a quorum varies depending on the nature of the business to be transacted. Article VI, § C, established the rules for a quorum: "A majority of the total membership of the Committee present in person or by proxy shall constitute a quorum to transact all business of the Committee except where the action of the Committee requires a larger number of members as specially set forth in these Bylaws."

Karamo focuses on the word "except" and argues that it refers back to the term "quorum" such that, for business that must be passed by a super majority, the quorum must be redetermined at the moment that such business is to be transacted and must be determined in light of the conditions applicable to the supermajority vote on that item of business. In that way, she maintains that a vote to remove an officer has a separate quorum requirement that shows that there is only a quorum to make that vote if 75% of the members are present without counting proxies. The trial court correctly rejected that interpretation.

Unless the context requires otherwise, it is a general rule of grammar that a relative clause or qualifying phrase is confined to the last antecedent. *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999). Under that rule of grammar, the clause introduced by "except" modifies "all business." Under that construction, the bylaws provide that—just because the members may conduct all business if they have a quorum—they must still comply with the supermajority requirements stated in other sections of the bylaws.

This interpretation also better fits with the remaining provisions of the bylaws. With Karamo's preferred interpretation, a quorum does not depend on the total number of members, but varies depending on the business at issue. For example, a vote to remove an officer may only be made by 75% of the members voting and present and without counting proxies under Article IV, § G(2) of the bylaws. That section makes no mention of the total membership, so there is no way to calculate whether there is a quorum by reference to that section. A similar problem applies for the votes required under Article III, § K(1), Article X, § B, and Article XV, § C. Because Karamo's preferred interpretation provides an impossible standard for calculating a quorum, and creates varying requirements for a quorum from item to item, the better interpretation is that the clause introduced by "except" in Article VI, § C modifies the business that may be decided by a bare majority and does not apply to the base for establishing a quorum. *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 297; 778 NW2d 275 (2009) ("[C]ontract terms should not be considered in isolation and contracts are to be interpreted to avoid absurd or unreasonable conditions and results.").

The undisputed evidence showed that 71 members of the 107 total regular members appeared at the meeting held on January 6, 2024, which plainly constituted a quorum under Article VI, § C. There was also, contrary to Karamo's contention on appeal, no evidence that members left in such a way as to deprive the meeting of a quorum.[10] Of those members who appeared, 45 appeared in person and were allowed to vote on the motion to remove Karamo as chairperson of the State Committee. The members held the vote, and 40 of those 45 voted to remove Karamo, which was more than the required 75% of the in-person and voting members. Consequently, given the undisputed evidence, the members who appeared at the special meeting held on January 6, 2024, validly removed Karamo as chairperson of the State Committee as a matter of law.

Karamo has not identified any errors in the trial court's application of the law to the undisputed facts. Under the undisputed facts, the State Committee's members held a valid special meeting on January 6, 2024, and properly removed Karamo as the State Committee's chairperson at the special meeting. Consequently, the trial court did not err when it granted plaintiffs' motion for summary disposition under MCR 2.116(C)(10).

Affirmed.

/s/ Michael F. Gadola
/s/ Brock A. Swartzle
/s/ Anica Letica

---

[10] Robert's Rules of Order recognizes that a quorum may be lost by members leaving a meeting. See Robert's Rules of Order, Newly Revised (12th ed), § 40:12, pp 331-332. There is no provision for losing a quorum because those members present through a proxy are not permitted to vote on an item of business.